Filed 10/20/23 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| YERBA BUENA NEIGHBORHOOD CONSORTIUM, LLC, | A166091 |
| Plaintiff and Appellant, | |
| v. | (Alameda County Super. Ct. No. RG21090517) |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., | |
| Defendants and Respondents; | |
| PARNASSUS NEIGHBORHOOD COALITION et al., | (Alameda County Super. Ct. No. RG21088939) |
| Plaintiffs and Appellants, | |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., | |
| Defendants and Respondents; | |
| SAN FRANCISCANS FOR BALANCED AND LIVABLE COMMUNITIES, | A166094 |
| | (Alameda County Super. Ct. No. RG21089332) |
| Plaintiff and Appellant, | |
| v. | **ORDER MODIFYING OPINION; AND DENYING PETITIONS FOR REHEARING AND PUBLICATION** |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants and Respondents. | **[NO CHANGE IN JUDGMENT]** |

_____

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections IV through VII, IX, and XI of the Discussion.

1

**BY THE COURT:**[*]

It is ordered that the opinion filed herein on September 20, 2023, be modified as follows:

1) On page 30, at the end of the last sentence of the first full paragraph, which reads, "And the final EIR explains that new transit riders will be distributed among four transit routes in the immediate vicinity of the campus, with no 'requirement of additional or expanded transit infrastructure . . . identified based on these new riders,' " add as footnote 5 the following footnote:

> The final EIR goes on to state that the Plan "is not responsible for analyzing the potential effects of Muni operational issues or changes, and Muni is expected to adjust operations accordingly in response to changes in demand on a citywide basis over the thirty-year implementation of the [Plan]." We disagree with Petitioners YB who assert, in a petition for rehearing, that this sentence addressing *operational* issues vitiates the preceding sentence about the adequacy of *infrastructure*, but in any event, our analysis does not turn on this portion of the final EIR.

The subsequent footnotes are renumbered as appropriate.

2) On page 43, the second to the last sentence in the first paragraph, which reads, "But in any event, we note that only the Research and Academic Building is anticipated to produce significant operational TAC emissions," is modified to read:

> But in any event we note that, among the initial-phase projects whose operational TAC emissions were considered on a project level, only the Research and Academic Building is anticipated to produce significant operational emissions.

---

[*] Tucher, P.J., Fujisaki, J., and Rodríguez, J. participated in the decision.

The petition for rehearing filed by petitioners in No. A166091 on October 5, 2023, is denied.

The request for publication of certain portions of the opinion submitted on behalf of the California Building Industry Association on October 6, 2023, is denied.

There is no change in the judgment.

TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

Trial Court:      Alameda County Superior Court

Trial Judge:      Hon. Frank Roesch

Counsel:      Soluri Meserve, Patrick M. Soluri, Osha R. Meserve, and James C. Crowder for Plaintiffs and Appellants Yerba Buena Neighborhood Consortium, LLC and Parnassus Neighborhood Coalition et al.

Thomas N. Lippe for Plaintiff and Appellant San Franciscans for Balanced and Livable Communities

The University of California Office of General Counsel, Anagha Dandekar Clifford; Lubin Olson & Niewiadomski, Charles R. Olson, Philip J. Sciranka, Carolyn J. Lee; Monchamp Meldrum, Amanda J. Monchamp, and Hope Schmeltzer for Defendants and Respondents

*Yerba Buena Neighborhood Consortium, LLC et al. v. Regents of the University of California/San Franciscans for Balanced and Livable Communities v. Regents of the University of California* (A166091/A166094)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| YERBA BUENA NEIGHBORHOOD CONSORTIUM, LLC,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>        Defendants and Respondents. | A166091<br><br>(Alameda County Super. Ct. No. RG21090517) |
| PARNASSUS NEIGHBORHOOD COALITION et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>        Defendants and Respondents. | (Alameda County Super. Ct. No. RG21088939) |
| SAN FRANCISCANS FOR BALANCED AND LIVABLE COMMUNITIES,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>        Defendants and Respondents. | A166094<br><br>(Alameda County Super. Ct. No. RG21089332) |

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections IV through VII, IX, and XI of the Discussion.

1

Petitioners in these consolidated appeals challenge the adequacy of an environmental impact report (EIR) prepared in connection with the Comprehensive Parnassus Heights Plan (Plan), a long-range planning document intended to guide future development of a campus of the University of California, San Francisco (UCSF or university). The Plan stirred controversy because it anticipates considerably more intensive development on that campus than was projected in the university's existing long-range development plan, which was prepared only a few years prior.

Petitioners contend that, for a variety of reasons, the EIR fails to comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[1] The trial court found the EIR compliant and entered judgment for the Regents of the University of California (Regents).

We will affirm. In the published portions of this opinion, we hold (1) the EIR considers a reasonable range of alternatives to the Plan and need not have considered in detail an alternative that placed some of the anticipated development off campus; (2) the EIR improperly declines to analyze the impact of the Plan on public transit, but the error is not prejudicial because the EIR adequately informs the public and decisionmakers regarding that impact; (3) we need not scrutinize the EIR's analysis of visual impacts because section 21099, subdivision (d)(1) directs that aesthetic effects of an "employment center project on an infill site within a transit priority area" be deemed not significant; (4) the EIR is not required to adopt a mitigation measure preserving certain historically significant buildings merely because it is possible to restore and repurpose the buildings; and (5) the EIR's

_____

[1] All subsequent statutory references are to the Public Resources Code, unless indicated otherwise.

mitigation measure for wind impacts establishes a sufficiently specific performance standard that the mitigation will achieve and adequately identifies the type of actions to be taken to achieve that standard. In the unpublished portions of the opinion, we address and reject petitioners' remaining claims.

## FACTUAL AND PROCEDURAL BACKGROUND

UCSF is a world-renowned medical complex, research center, and professional school. Its Parnassus Heights campus (Parnassus campus), the university's first home, is a 107-acre site in the Inner Sunset neighborhood of San Francisco, south of Golden Gate Park. The Parnassus campus currently accommodates two hospitals, a variety of medical clinics, four professional schools, a graduate program, and space for research, student housing, parking, and other support uses. Over half of its hilly site is dedicated as public open space.

In 2014, UCSF prepared a long-range development plan (2014 LRDP) for the university as a whole, which consists of campuses at Parnassus Heights, Mission Bay, Mount Zion, Mission Center, and Laurel Heights, as well as assorted smaller sites and buildings around San Francisco. (See Ed. Code, § 67504, subd. (a)(1) [requiring such plans].) Consistent with a preexisting policy, the 2014 LRDP was structured to "[a]ccommodate the majority of UCSF's growth" through 2035 at the Mission Bay campus. That policy arose from long-standing concerns that "the size of [the Parnassus campus] was beginning to overwhelm" its neighborhood. As long ago as 1976, these concerns had induced the Regents to adopt a resolution capping building space at the Parnassus campus at 3.55 million gross square feet (gsf). The 2014 LRDP reaffirmed this policy, while amending it to exclude all on-campus housing from the ceiling. Acknowledging that the buildings on

campus already exceeded the resolution's cap, the 2014 LRDP adopted a plan for development that would have resulted in a net reduction.

The primary changes slated for the Parnassus campus under the 2014 LRDP were the construction of a new addition to one of its two hospitals, the demolition of a series of older buildings, and the conversion of other buildings to accommodate student and faculty housing. The smaller of the two existing hospitals, Moffitt Hospital, does not comply with seismic standards for inpatient hospitals that take effect in 2030. (See Sen. Bill No. 1953 (1993–1994 Reg. Sess.) § 1.) Rather than attempt to bring Moffitt into compliance, the 2014 LRDP proposed to build an addition to Long Hospital and repurpose Moffitt for outpatient and hospital support services. The net result would have been a small reduction in inpatient beds at the Parnassus campus, from 475 to 439.

The university thereafter had a change of heart. According to the EIR, UCSF concluded it had neglected the Parnassus campus while focusing on development at Mission Bay, leaving the Parnassus campus in need of "substantial renewal and investment."[2] In 2020, UCSF undertook the Comprehensive Parnassus Heights Plan with the objective "to re-envision and revitalize" the Parnassus campus, so that UCSF would "remain a leading health science institution both nationally and internationally." The Plan was intended "to meet projected space needs for critical programs in research, patient care, and education at the Parnassus Heights campus site while improving the functional and aesthetic design of the campus environment"

---

[2] The Plan evolved as the environmental review process proceeded. Unless otherwise noted, references to "the EIR" are to the final draft version of the *UCSF Comprehensive Parnassus Heights Plan Environmental Impact Report*, dated January 2021.

and providing "much-needed on-campus housing." The Plan amends the 2014 LRDP with respect to development on the Parnassus campus.

In general, the Plan presents a thorough rethinking of the design of the Parnassus campus. At its heart, the Plan is a catalog of proposed new buildings, the identification of places on campus to put them and the infrastructure necessary to support them, and a general timeline for their construction, extending to year 2050. As an organizing principle, the Plan divides the campus into six geographic districts, each projected to contain buildings serving a particular function. The initial phase of redevelopment, slated for completion by 2030, calls for enhancement of the campus entrance, construction of two major new buildings, replacement of some student housing, and upgrades to campus infrastructure, including a tunnel and bridge connecting buildings on either side of Parnassus Avenue. The two major buildings are a large new hospital, called "New Hospital," and an eight-story Research and Academic Building. Construction of other buildings and infrastructure enhancements are proposed to occur after 2030. Eight significant existing structures, including current or potential historic resources, and a series of smaller housing units are identified as candidates for demolition.

In total, the Plan anticipates a 50 percent net increase in building space on the Parnassus campus over the next 30 years—from approximately four million to six million gsf. The centerpiece is the New Hospital, which would replace the 150 beds in Moffitt Hospital and add more than 200 additional beds, increasing the campus's hospital capacity to 675 beds. The New Hospital building, anticipated to be 16 stories tall, would provide nearly 1 million gsf of space. The university explained the Plan's proposal to raise the space ceiling adopted in 1976 by an anticipated 1.5 million gsf, or 42

5

percent, as "recognition of the tremendous need for program space at the campus site in order for UCSF to retain its leadership position in patient care, research, and education."

With regard to hospital space, for example, the EIR describes existing capacity as woefully insufficient. Not only are the campus's two hospitals consistently full, but they have been turning away thousands of patient transfer requests annually for lack of space. Between 2017 and 2019, UCSF turned away about 40 percent of "requested medically necessary transfers," and the university anticipates the number of requests will increase significantly in the future, particularly for the complex cases in which the Parnassus campus specializes. Such patients require longer hospital stays, further increasing the demand for beds.

Pursuant to CEQA, the Regents prepared and certified an EIR for the Plan. The EIR serves as a project EIR for the construction proposed to occur in the initial phase of the Plan, with the exception of the New Hospital. A project EIR, the most common type of EIR, examines the environmental impacts of all phases of a specific development project, including planning, construction, and operation. (Cal. Code of Regs., tit. 14, § 15161;[3] *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1169 (*Bay-Delta*).) The EIR serves as a program EIR with respect to the Plan as a whole and its remaining individual components, including the New Hospital. A program EIR is generally prepared for a series of actions that can together be characterized

_____

[3] We will cite and refer to CEQA's implementing regulations, codified at title 14, division 6, chapter 3 of the California Code of Regulations, as the "Guidelines." As the California Supreme Court explains, the CEQA Guidelines are given "great weight in interpreting CEQA, except where they are clearly unauthorized or erroneous." (*Center for Biological Diversity v. Dept. of Fish & Wildlife* (2015) 62 Cal.4th 204, 217, fn. 4.)

as one large project, and it may be used before specific components of a project are ready for approval; these may then require follow-on environmental review. (See Guidelines, § 15168, subds. (a)–(c); *Center for Biological Diversity v. Dept. of Conservation, etc.* (2019) 36 Cal.App.5th 210, 230.)

The primary significant and unavoidable adverse impacts of the Plan, as found by the EIR, are (1) the creation of wind hazards in public areas on campus, largely associated with the bulky New Hospital building, (2) an increase in air pollutants resulting from more intensive use of the campus, (3) the demolition of historically significant structures, and (4) an increase in ambient noise levels during construction.

Petitioners filed three separate challenges to the adequacy of the EIR and stipulated to joint briefing and hearing of their petitions. The trial court denied each of the petitions in three identical orders.

Petitioner San Franciscans for Balanced and Livable Communities (petitioner SF) filed an appeal from the judgment in its action, while petitioners Yerba Buena Neighborhood Consortium, LLC, and Parnassus Neighborhood Coalition, et al. (jointly, petitioners YB) filed a joint appeal from the judgments in their respective actions. The two sets of petitioners raise different issues, although they also incorporate each other's arguments by reference. (See Cal. Rules of Court, rule 8.200(a)(5).) We issued an order consolidating the two appeals for briefing and hearing, and we address below first the arguments raised by petitioners YB (sections II through VI), then the arguments of petitioner SF (sections VII through XII).[4]

---

[4] We note that the parties have filed several requests for judicial notice. The Regents filed requests in No. A166094 on April 2 and August 25, 2023; petitioners YB filed a request in No. A166091 on April 24, 2023; and petitioner SF filed a request in No. A166094 on August 25, 2023. Requests

## DISCUSSION

### I. Governing Law

#### A. CEQA

CEQA "require[s] state and local governmental entities to perform their duties 'so that major consideration is given to preventing environmental damage.' " (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 711–712.) The beating heart of CEQA is its EIR. (*Bay-Delta, supra,* 43 Cal.4th at p. 1162.)

Whenever a public agency proposes to undertake a project that may have a significant impact on the environment, CEQA requires the agency to prepare and certify an EIR. (§ 21100, subd. (a); *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1187 (*San Diego*).) "The [EIR] must include a description of the proposed project and its environmental setting and discussions of (1) the possible environmental effects of the project, (2) feasible measures to mitigate any significant, adverse environmental effects of the project, (3) the comparative environmental effects of a range of reasonable alternatives to the proposed

for judicial notice are rarely appropriate in CEQA cases. As the Supreme Court explained in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, footnote 4, "it would never be proper to take judicial notice of evidence that (1) is absent from the administrative record, *and* (2) was not before the agency at the time it made its decision. This is so because only relevant evidence is subject to judicial notice [citations], and the only evidence that is relevant to the question of whether there was substantial evidence to support a quasi-legislative administrative decision under Public Resources Code section 21168.5 is that which was before the agency at the time it made its decision." With that understanding, we have reviewed the information of which the parties seek judicial notice, and we deny all requests. To the extent material was proffered for some purpose other than to bolster substantial evidence supporting the EIR's conclusions, we conclude the material is not relevant to our consideration of dispositive issues.

project, including a 'no project' alternative, and (4) the cumulative impact of the project's various environmental effects." (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 627 (*Butte County*).) In this way, an EIR serves "to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a).) The EIR "inform[s] the public and its responsible officials of the environmental consequences of their decisions *before* they are made." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta Valley*).)

The EIR's alternatives analysis must consider "a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project." (Guidelines, § 15126.6, subd. (a).) Accordingly, "an EIR should not exclude an alternative from detailed consideration merely because it 'would impede to some degree the attainment of the project objectives.' " (*Bay-Delta, supra,* 43 Cal.4th at p. 1165; Guidelines, § 15126.6, subd. (b); see *Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1087.) The lead agency is responsible for selecting the alternatives to be examined and need not consider alternatives that "fail[] to meet most of the basic project objectives" or that are infeasible. (Guidelines, § 15126.6, subds. (a) & (c).)

When an EIR concludes that a project, as proposed, will have a significant effect on the environment, the EIR must propose mitigation measures. These are "modifications of the proposed design and implementation of a project . . . to reduce the project's adverse environmental effects." (*Butte County, supra,* 13 Cal.5th at p. 627; Guidelines, § 15126.4,

subd. (a)(1)(A).) With respect to a public project, such as the Plan, mitigation measures, once identified, must be made "fully enforceable" through "incorporat[ion] into the plan, policy, regulation, or project design." (Guidelines, § 15126.4, subd. (a)(2); *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 524–525 (*Sierra Club*) [agencies are required to implement all feasible mitigation measures].)

If an agency concludes that a proposed project will result in an environmental effect that cannot be reduced below the level of significance through the application of feasible mitigation measures, the project may not be approved unless the agency makes an express finding that "specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (§ 21081, subd. (b); *Butte County*, *supra*, 13 Cal.5th at pp. 627–628.) But even when a project's benefits are found to outweigh its significant environmental effects, "agencies are still required to implement all mitigation measures unless those measures are truly infeasible." (*Sierra Club*, *supra*, 6 Cal.5th at pp. 524–525.)

### B. *Standard of Review*

"In general, judicial review of agency actions for CEQA compliance extends to 'whether there was a prejudicial abuse of discretion.'" (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495 (*County of Stanislaus*).) " '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. [Citation.] Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedure, "scrupulously enforc[ing] all legislatively

10

mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions,' " asking only whether they are supported by substantial evidence. (*Sierra Club, supra,* 6 Cal.5th at p. 512.) For example, in determining whether an EIR appropriately considers alternatives, we independently review whether the EIR's alternatives analysis complies with CEQA's procedural mandates, and then decide whether substantial evidence supports the decisions made. (*Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 703 (*Save Our Capitol!*).)

A violation of CEQA's procedural requirements "is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463 (*Smart Rail*).) An agency's failure to disclose required information "may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law," but "[i]nsubstantial or merely technical omissions are not grounds for relief." (*Ibid.*; see *Rominger v. City of Colusa* (2014) 229 Cal.App.4th 690, 709, disapproved on other grounds, *San Diego, supra,* 7 Cal.5th at p. 1194 & fn. 10 ["we cannot conclude that [petitioners] are entitled to relief simply because the county failed to comply with CEQA. . . . Instead, we must look at the nature of the county's noncompliance to determine if it was of the sort that ' "preclude[d] informed decisionmaking and informed public participation" ' "].)

We " 'review[] the agency's action, not the trial court's decision.' " (*County of Stanislaus, supra,* 10 Cal.5th at p. 495.)

11

## II. An Offsite Alternative for New Hospital

Petitioners YB contend that the EIR fails to consider a reasonable range of alternatives to the project because it does not include an alternative locating the New Hospital somewhere other than the Parnassus campus. Petitioners suggest a new hospital could be built instead at UCSF's Mission Bay or Mount Zion campuses, or on a university-owned parcel in the Hunter's Point neighborhood. But it is not our role—or petitioners'—to decide where UCSF should build its next hospital. UCSF has devised the Plan, and because we conclude the EIR considers a reasonable range of alternatives to the Plan, we will reject this challenge to it.

### A. Alternatives in the EIR

In advocating for an alternative that places the New Hospital somewhere other than Parnassus Heights, petitioners YB neglect to address the alternatives the Regents actually analyzed. The EIR considers several in detail: two "No Project" alternatives—one consisting of no new development on campus and one with development according to the 2014 LRDP; a "Reduced Project" alternative; and two alternatives that hew closer to the Plan's proposal. In order to assess whether this range of alternatives is reasonable, we begin by looking more closely at each of the analyzed alternatives. (See *Goleta Valley*, *supra*, 52 Cal.3d at p. 566 ["[e]ach case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose"].)

The "No Project—No Development" alternative assumes no further development on campus. Although this alternative would preserve historically significant structures and avoid the environmental harms associated with development, it would also result in the loss of almost half of the campus's hospital beds, with the legally necessary decommissioning of

12

Moffitt Hospital for inpatient use. The EIR concludes that this no-development alternative "would not achieve . . . any of [the] proposed [Plan's] objectives," and is accordingly "both unrealistic and infeasible."

The "No Project—Development under 2014 LRDP" alternative anticipates build-out of the remaining development planned in the 2014 LRDP. Instead of the Plan's 2.04 million gsf of additional space, this alternative adds only .47 million gsf, so it has correspondingly smaller impacts on environmental and historical resources. This alternative would preserve the campus's hospital capacity at close to current levels through the expansion of Long Hospital, but the EIR concludes it would not satisfy the demand for "more beds to meet the demand for inpatient care for a growing and aging Bay Area population," and it would fail to meet certain other plan objectives.

The Reduced Project alternative allows three quarters as much development as the Plan (i.e., 1.53 million gsf of additional space). This alternative includes a smaller, although still large, New Hospital building, and seismic upgrades to Moffitt Hospital to allow its continued use as a hospital after 2030. The total number of hospital beds under the Reduced Project alternative is the same as under the Plan, once the Moffitt retrofit is complete. The Reduced Project alternative preserves all of the architecturally significant buildings that would be demolished under the Plan, but it omits the Plan's Research and Academic Building and four housing structures, as these would otherwise occupy the footprints of the preserved structures. With 25 percent less development than the Plan, this alternative would also diminish, if not eliminate, other significant impacts, such as wind hazards generated by large new buildings and a deterioration in air quality due to hazardous emissions and increased traffic. The EIR

13

concludes the Reduced Project alternative would not "fully" meet the Plan's objectives for several reasons: Moffitt Hospital would "continue to be outdated, undersized, and inflexible;" the Research and Academic Building would not be built; and there would be less new housing. But the EIR identifies the Reduced Project alternative as the environmentally superior alternative, other than the no-project alternatives.

The two other alternatives analyzed in the EIR are both smaller deviations from the Plan. One features a taller, 19-story New Hospital with a smaller footprint. The other is a phased option that divides the New Hospital into two smaller buildings, one of which would be built only after Moffitt Hospital is torn down. Both of these alternatives have environmental impacts almost the same as those of the Plan, except that the alternatives "could result in incrementally lower wind speeds near the northeast corner of the New Hospital," and would have slightly less impact on historical resources.

The EIR also contains summary descriptions of three alternatives that were considered for full analysis but rejected as failing to satisfy Plan objectives. The first of the dismissed alternatives involves building no New Hospital but upgrading the existing hospitals at the Parnassus campus and "continu[ing] to advance" plans under the 2014 LRDP for a new hospital at the Mission Bay campus. The EIR rejects this alternative because it would result in 284 fewer hospital beds at the Parnassus campus, "and hence at UCSF campus-wide," as compared to the Plan.

The second dismissed alternative involves siting the New Hospital where the Plan proposes to build the Research and Academic Building. The EIR rejects this alternative for several reasons, including operational

14

problems associated with locating the New Hospital across campus from the existing hospitals.

The third dismissed alternative involves building a New Hospital on UCSF's Mount Zion campus, "as previously studied in the 2002 *UCSF Mount Zion Master Planning Study*." The EIR rejects this alternative because it would be "inefficient" for UCSF to operate hospitals at three different campuses (Parnassus Heights, Mission Bay, and Mount Zion), and because building the hospital somewhere other than the Parnassus campus "would not help to achieve the benefits that can be realized through interdisciplinary collaboration and convergence between clinical care, research and education." Like the other screened-out alternatives, this one fails to satisfy most of the Plan's objectives, according to the EIR.

The final EIR reports that most comments on the draft EIR's slate of alternatives focused on options that would locate the New Hospital somewhere other than the Parnassus campus. The final EIR defends the range of alternatives explored and explains that, in addition to failing to meet the need to increase hospital capacity at the Parnassus campus and locate hospital facilities near the university's professional schools, building the New Hospital elsewhere would shift the environmental consequences of a new hospital to a different site in the city, rather than eliminating them.

### B. Analysis

When reviewing a challenge to an EIR's consideration of alternatives, courts apply a rule of reason: " 'the EIR [must] set forth only those alternatives necessary to permit a reasoned choice.' " (*Bay-Delta, supra*, 43 Cal.4th at p. 1163, quoting Guidelines, § 15126.6, subd. (f).) Necessarily, an EIR is not required to consider "every conceivable alternative to a project." (Guidelines, § 15126.6, subd. (a); *Save Panoche Valley v. San Benito County*

15

(2013) 217 Cal.App.4th 503, 521.) Rather, petitioners YB must show that the alternatives the EIR considers " 'are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' " (*Save Our Capitol!*, *supra*, 87 Cal.App.5th at p. 703.)

We begin by noting that the EIR evaluates alternatives that provide a range of different *amounts* of new development: *none* in the no-development alternative, *a little* in the 2014 LRDP alternative, *a medium amount* in the Reduced Project alternative, and *a large amount* in the remaining alternatives. But a reasonable range of alternatives requires more than just quantitative variety. " '[T]he key to the selection of the range of alternatives is to identify alternatives that meet most of the project's objectives but have a reduced level of environmental impacts.' " (*Save Our Capitol!*, *supra*, 87 Cal.App.5th at p. 704.) We, accordingly, review the project's objectives and its environmental impacts.

The project has multiple objectives, but most are variants of a central theme: the need to "[r]evitalize the aging Parnassus Heights campus to enhance its place as a premier educational, research, and clinical institution." The EIR's list of objectives goes on for three pages and includes some carried over from the 2014 LRDP, such as these: that the Parnassus campus remain the central location for classroom instruction and that it provide space "to foster collaboration and to facilitate the interdependence and connectivity . . . of instruction, clinical, research and support uses in close physical proximity to each other." The list of objectives also includes some specific to aspects of the new Plan. Among these are to "[s]ite and develop a new inpatient facility in a way that optimizes operational activities with other clinical facilities at Parnassus Heights," and to "[i]ncrease inpatient beds at Parnassus Heights to address severe constraints on capacity and access to care."

16

The Plan's environmental impacts are primarily of two kinds: those associated with building a particularly large building, and those associated with increasing the overall level of development on campus. In the first category are "wind hazards in publicly accessible areas of substantial pedestrian use." The EIR determines that the Plan will have significant and unavoidable impacts of this kind because the New Hospital will be taller than the buildings around it. In the second category are impacts like construction noise, which will accompany each new building project; harm to historical resources, which will occur when older buildings of significance are torn down to make room for new ones; and harms to air quality, which will accompany more intensive use of the campus. These are significant and unavoidable environmental effects of the Plan, and CEQA requires the EIR to consider alternatives that would substantially lessen or avoid them, if that can be done while "attain[ing] most of the basic objectives of the project." (Guidelines, § 15126.6, subd. (a).)

The alternatives evaluated in the EIR address these environmental harms. Most dramatically with regard to historical resources, all of the architecturally significant buildings are preserved under the Reduced Project alternative. With regard to wind hazards, there are options for reducing these by reducing the size of the New Hospital building (e.g., the Reduced Project alternative) and by changing its configuration (e.g., the smaller footprint and phased alternatives). Air quality and construction noise effects were also reduced in the Reduced Project alternative. And, of course, all of the environmental effects were improved in the low-growth 2014 LRDP alternative.

We are persuaded that, taken together, this represents a reasonable range of alternatives. The 2014 LRDP alternative and the Reduced Project

17

alternative, in their differing ways, would substantially reduce the significant and unmitigable environmental impacts of the project. But, as the EIR understandably concludes, these lower-growth alternatives fail to meet the objectives of the Plan, which is intended to upgrade aging facilities and expand the space available to house students and faculty and treat a growing population of patients requiring inpatient care. Meeting the Plan's objectives, in other words, necessarily requires considerable new development on campus. Rounding out this slate of alternatives, the two options with different designs for the New Hospital (the smaller footprint and phased alternatives) demonstrate the possibility of minor improvements in environmental effects, although each has its own drawbacks. We conclude that the considerable variation among these alternatives and their differing approaches to addressing environmental harms are sufficient to foster informed decisionmaking and public participation, as required by CEQA. (Guidelines, § 15126.6, subd. (a).) The EIR's alternatives analysis thus complies with CEQA's procedural mandate.

Petitioners YB fault the EIR for failing to analyze an offsite alternative for New Hospital, but the Regents were under no legal duty to consider that type of alternative. CEQA Guidelines section 15126.6, subdivision (a), which prescribes the scope of an alternatives analysis, states that an agency must "describe a range of reasonable alternatives to the project, *or* to the location of the project." (Italics added.) The guideline anticipates that a different location can constitute one of a range of reasonable alternatives, but it does not require such an alternative. (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 491 ["an agency may evaluate on-site alternatives, off-site alternatives, or both"].) Further, petitioners do not propose an alternative location for the project, but only for one component of

18

the project. The project is a plan for the development of the Parnassus campus. Development elsewhere is, in a sense, beyond the scope of the project. Although the Regents could have considered an alternative that placed some of the Plan's anticipated development off campus, if such an alternative could meet most of the Plan's basic objectives, nothing compelled them to consider such an alternative.

In fact, the EIR did briefly address the option of placing the New Hospital at Mount Zion, before rejecting that alternative as inconsistent with the Plan's objectives. We conclude that substantial evidence supports that decision, given the importance the Plan's objectives place on collaboration among those involved in clinical care, research, and education. UCSF placed great emphasis on maintaining these activities together at the Parnassus campus, apparently concerned that relocating inpatient care to a cross-town facility would complicate the critical use of the hospital's patients for teaching, as well as separate clinicians at the hospital from ready contact with the researchers supporting their work. In this way, relocating the New Hospital would frustrate the overall objective of allowing the campus to "remain a leading health science institution both nationally and internationally." (See *Jones v. Regents of University of California* (2010) 183 Cal.App.4th 818, 829 ["substantial evidence supports the determination that the offsite alternative would not achieve the Lab's objectives of creating a more campus-like setting with the goal of enhancing collaboration, productivity, and efficiency"].) "[A]n EIR need not study in detail an alternative that . . . the lead agency has reasonably determined cannot achieve the project's underlying fundamental purpose." (*Bay-Delta, supra,* 43 Cal.4th at p. 1165.)

19

Petitioners YB protest that this EIR has no "fundamental purpose" of the sort discussed in *Bay-Delta*. Certainly, the EIR does not label any of its many objectives as the "fundamental purpose" of the Plan, but any reasonable reader reviewing the Plan's multiple objectives will recognize that co-locating clinical, teaching, and research personnel at the Parnassus campus is fundamental to the Plan's purpose. As our Supreme Court has explained, "if the purpose of the project is to build an oceanfront resort hotel [citation] or a waterfront aquarium [citation], a lead agency need not consider inland locations." (*Bay-Delta*, *supra*, 43 Cal.4th at p. 1166.) So, here, where the purpose is to revitalize the Parnassus campus, including by expanding its capacity to treat patients in state-of-the-art hospital facilities, the Regents need not have considered off-campus alternatives.

We find guidance in *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957 (*Native Plant Society*). In that case, the court considered an EIR prepared for a master plan for a large open-space property owned by a city. (*Id*. at pp. 967–968.) The key objectives of the Plan were the preservation of certain wild habitats, particularly those supporting the Santa Cruz tarplant, and the creation of a system of pedestrian-only and multi-use trails, the latter designed for use by pedestrians, bicycles, wheelchairs, and leashed dogs. (*Id*. at p. 970.) In addition to a no-project alternative, the EIR considered three alternatives that differed only in their proposed trail systems; each reduced access by, for example, omitting paved trails. (*Id*. at pp. 972–973.) The EIR did not consider any offsite alternatives for the multi-use paths. (*Id*. at p. 988.)

The petitioners contended that the EIR should have considered an alternative locating a particular bicycle path offsite because this would " 'completely avoid significant and unavoidable impacts to the Santa Cruz

20

tarplant.' " (*Native Plant Society*, *supra*, 177 Cal.App.4th at p. 992.) The final EIR responded by citing the nature of the project as a master plan for the property, not for other locations in the city, and environmental evaluations undertaken prior to the EIR that had considered offsite trail alternatives. (*Ibid*.) The court found the final EIR had "adequately informed the public and the decisionmaking body about the existence of offsite alternatives for the [bicycle path] and the reasons for excluding them from the analysis." (*Ibid*.) The court further rejected the petitioners' challenge on three grounds. First, CEQA does not require consideration of an offsite alternative in every case. (*Id.* at p. 993.) Second, the requirement that an EIR describe alternatives to the proposed project "is 'applicable only to the project as a whole, not to the various facets thereof.' " (*Ibid*.) CEQA does not compel consideration of alternatives to a component of a project, the court held. (*Ibid*.) Third, the court found substantial evidence in the administrative record to support the decision to exclude offsite trail alternatives in the "extensive prior consideration" given to such trails. (*Id.* at p. 994.)

We conclude that the omission of an alternative placing the New Hospital at a location off campus does not violate CEQA for essentially the same reasons. Nothing in CEQA required the Regents to discuss an offsite alternative, let alone an offsite location for one component of the Plan. The Regents satisfied their informational obligations by disclosing a previously studied option to build a new hospital at Mount Zion and explaining why they rejected this option as infeasible. Finally, as we have explained, substantial evidence in the record supports the Regents' conclusion that such an alternative would not adequately meet the project's objectives. Petitioners YB have failed to carry their burden of demonstrating "that the alternatives

21

'are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' " (*Save Our Capitol!*, *supra*, 87 Cal.App.5th at p. 703.)

### III.  Public Transit

Petitioners YB contend that the EIR improperly fails to analyze the Plan's impact on public transit in San Francisco.  We agree that substantial evidence supports an argument that the Plan might have a significant impact on public transit, requiring its discussion in the EIR.  The EIR incorrectly asserts that project-induced changes to transit operations, including effects on transit ridership, capacity, and delays, are "outside the scope of the CEQA analysis," and it discusses the project's effects on transit operations only briefly, in an appendix and "for informational purposes only."  In light of the requirement that an EIR discuss any potentially significant environmental effects, this was error.  We conclude, however, that the error was not prejudicial because the EIR and the appendix, taken together, contain sufficient information about transit impacts to serve the EIR's function as an informational document, especially in light of CEQA guidance regarding the transportation impacts of infill development near major transit stops.

### A.  *Background*

Although the EIR declines to analyze the Plan's impact on public transit operations, it fulsomely describes existing public transit serving the campus, as part of a chapter looking broadly at the Plan's transportation impacts.  The same chapter also describes UCSF's Transportation Demand Management program, which includes incentives for people to use public transit, and a UCSF-operated shuttle system connecting the Parnassus campus to regional public transit and other UCSF sites.  Most importantly, the EIR's transportation chapter analyzes the projected effects of the Plan on travel demand—the number of trips to or from the campus expected daily

22

and during the evening rush hour—and travel mode—whether travel is by public transit, solo driver, UCSF shuttle, passenger drop off, etc. The chapter concludes that the number of persons using the campus and the number of trips they take will increase by 50 to 55 percent under the Plan, and that the proportion of these trips occurring on public transportation will remain approximately the same as it is today. The EIR also looks at where people are traveling to or from, and at how the Plan will affect demand for parking and loading spaces. It reports, for example, that when the Plan is fully implemented "45 passenger loading instances would occur simultaneously during the peak minute of the peak hour," a 240 percent increase over current conditions. And all of the numbers characterizing travel demand are broken out separately for regular commuters (faculty, staff, and students), patients and other visitors, and on-campus residents.

When it comes to assessing the impacts of the Plan on transportation, the EIR chooses significance criteria that address public transit only at a bureaucratic or programmatic level. Specifically, the first criterion is whether implementation of the Plan would conflict with a public law or policy addressing transportation. To assess this, the EIR measures the Plan against the 2014 LRDP, the University of California's Sustainable Practices Policy, and various policies the City and County of San Francisco (the City) has adopted under the rubrics of its Transit First Policy, Better Streets Plan, and Bicycle Strategy. The EIR concludes the Plan would not conflict with any of these plans and policies.

The second transportation-related significance criterion is whether implementation of the Plan would be consistent with CEQA Guidelines section 15064.3, subdivision (b), which establishes criteria for analyzing transportation impacts. But this guideline is primarily directed at vehicle

miles traveled (VMT), a measure of traffic volume not directly related to public transit. Guidelines section 15064.3 provides that VMT "exceeding an applicable threshold of significance may indicate a significant impact." (Guidelines, §15064.3, subd. (b)(1).) In assessing the project's effect on VMT, the EIR assumes that the number of parking stalls available on campus will decrease by 17 percent under the Plan and that many people who currently drive alone will instead be dropped off, including by taxis and rideshare services. As a result, the EIR forecasts a near doubling of daily vehicle trips to and from the Parnassus campus by the end of the Plan period. But the EIR again finds the impact on transportation to be less than significant, since the daily VMT will remain well below regional averages.

An appendix to the EIR analyzes the localized effects of increased traffic congestion around campus. The analysis includes detailed quantitative modeling of traffic forecast for different times of day and resulting in different amounts of expected delay at each of 17 intersections around campus. The appendix also discusses how this traffic slow-down will likely affect public transit. It anticipates that drivers queuing or circling for parking "may periodically" delay public transit along Parnassus Avenue and Irving Street and may block transit stops. This is particularly likely during "peak passenger travel periods," when demand for passenger loading space may be greater than supply in certain locations. Neither the EIR nor the appendix evaluates quantitatively the impact of increased traffic on the transit system, and the EIR identifies no significance criterion against which any such delays should be assessed.

In a general response to comments questioning the EIR's failure fully to analyze impacts on public transit, the final EIR explains that (1) Appendix G to the CEQA Guidelines does not include a question related to public transit

and (2) under CEQA Guidelines section 15064.3, a project's effect on automobile traffic delays does not constitute an environmental impact. The final EIR also notes that the City monitors transit ridership and would be expected to modify its service to the extent necessary to accommodate demand over the 30-year time horizon of the Plan. The Regents' defense on appeal relies on similar arguments.

### B. Analysis of Failure to Address Public Transit Impacts

"Under CEQA, an agency must determine what, if any, effect on the environment a proposed project may have." (*CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 504.) To that end, the EIR "must identify and discuss 'all significant effects on the environment' of a proposed project." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 792; Guidelines, § 15126, subd. (a).) The term " '[s]ignificant effect on the environment' " is defined as "a substantial, or potentially substantial, adverse change in the environment." (§ 21068; Guidelines, § 15382.) Because a particular environmental effect can only be identified as significant after careful consideration, an EIR is required to discuss and analyze a possible impact of the project if there is a fair argument that it constitutes a significant effect on the environment. (*Visalia Retail, LP v. City of Visalia* (2018) 20 Cal.App.5th 1, 13 (*Visalia Retail*); see *Butte County*, *supra*, 13 Cal.5th at p. 627 [EIR must discuss "the possible environmental effects of the project"].)

"An agency must find a 'fair argument' if there is any substantial evidence to support that conclusion, even if there is competing substantial evidence in the record that the project will not have a significant environmental effect." (*World Business Academy v. State Lands Com.* (2018) 24 Cal.App.5th 476, 499 (*World Business Academy*).) And we review the

agency decision " 'de novo, *with a preference for resolving doubts in favor of environmental review.*' " (*Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1035.)

Here, substantial evidence supports the proposition that the Plan could cause "a substantial, or potentially substantial, adverse change" (Guidelines, § 15382) in public transit service near the campus. The number of persons visiting the campus is projected to increase by over 50 percent, and for regular commuters, almost a third of these trips will continue to occur by public transit. Taken at face value, this suggests the potential for a significant increase in the use of public transit serving the campus. Although this does not necessarily imply that the Plan will cause public transit delays, it raises that possibility. Indeed, the Regents were informed by the UCSF president, in a memorandum prepared in connection with certification of the EIR, that "[t]he plan would increase traffic and demand for . . . public transit service."

The Regents offer no adequate reason for failing fully to analyze the Plan's impact on public transit. The final EIR's initial reason for declining to address the impact on public transit, that Appendix G of the CEQA Guidelines does not include a question related to public transit, cannot justify the failure. Appendix G is an " 'Environmental Checklist Form' that may be used in determining whether a project could have a significant effect on the environment and whether it is necessary to prepare a negative declaration or an EIR." (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 896, fn. 5; see Guidelines, § 15063, subd. (f).) The appendix is not, and does not purport to be, a comprehensive listing of possible significant impacts. To the contrary, Appendix G expressly informs users that it is "a sample form that may be tailored to . . . project circumstances,"

26

and that "potential impacts that are not listed on this form must also be considered." (Guidelines, Appendix G: Environmental Checklist Form, at p. 1.) Given this limited role, the failure of Appendix G to mention a particular impact does not justify the failure to discuss it. (*Save Our Access etc. v. Watershed Conservation Authority* (2021) 68 Cal.App.5th 8, 27 [although Appendix G contains no reference to impact on parking, the discussion of "parking as an environmental factor is dependent 'on the project and its setting' "].)

The second reason provided by the final EIR, that under CEQA Guidelines section 15064.3, subdivision (a), a project's impact on vehicle traffic delays does not constitute a significant impact, is equally unavailing. Although traffic and transit delays are often connected—that is, traffic delays may lead to transit delays—a project can adversely affect public transit in ways other than by causing a delay, for example, by increasing the demand for transit infrastructure. Confirming the independence of these topics, the Guideline subdivision on which the Regents rely directs that "the effects of the project on transit" should be discussed when relevant. (Guidelines, § 15064.3, subd. (a).) And a "Technical Advisory on Evaluating Transportation Impacts in CEQA" published by the Governor's Office of Planning and Research (OPR) is unequivocal: "lead agencies should consider project impacts to transit systems." (OPR, Technical Advisory on Evaluating Transportation Impacts in CEQA (Dec. 2018) p. 19 (Technical Advisory) <http://www. opr.ca.gov/docs/20190122-743_Technical_Advisory.pdf> [as of Sept. 20, 2023]; see also § 21099, subd. (b)(1) [tasking OPR with proposing relevant guidelines].) If there were any remaining question, the state statute from which the Guideline's exemption of traffic delays is derived, Public Resources Code section 21099, instructs that "[t]his subdivision does not

relieve a public agency of the requirement to analyze . . . any other impact associated with transportation." (§ 21099, subd. (b)(3).)

The final EIR also suggests, without expressly stating, that the Plan's effect on public transit need not have been discussed because "UCSF does not control the provision of public transit service" in San Francisco, which operates under the authority of the San Francisco Municipal Transportation Agency (Muni). We are unaware of any authority suggesting that an EIR is excused from discussing an environmental impact merely because another agency will share responsibility for addressing that impact. An important function of the EIR is to provide information about the anticipated environmental effects of a project, not only to decisionmakers and the public but also to other interested governmental entities. (See *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 383 (*Building Industry*) [CEQA statute "focus[es] on informed decisionmaking and self-government"].) Reflecting its understandable interest in this issue, the City submitted a comment on the draft EIR questioning its failure to discuss "the plan's impact on Muni service and transit delay." As a tacit acknowledgment that implementing the Plan will indeed affect public transit, the Regents then negotiated with the City a Memorandum of Understanding committing the university to pay $20 million toward transit improvements "to address . . . transit impacts near the campus." With this and other "generous community benefits" secured, the City endorsed adoption of the Plan. Appropriately, the Regents worked with the City to address the transit impacts of the Plan, even though they failed adequately to discuss them in the EIR. (See Technical Advisory, *supra*, at p. 19 ["Lead agencies should consult with transit agencies as early as possible"].)

28

Finally, the Regents argue before this court that they were entitled to presume that the Plan's effect on public transit was not significant on the authority of Guidelines section 15064.3, subdivision (b), which states in connection with land use projects: "Generally, projects within one-half mile of either an existing major transit stop or a stop along an existing high quality transit corridor should be presumed to cause a less than significant transportation impact." Although reliance on the guideline might permit the Regents to conclude that the project's impact on public transit is not significant, nothing suggests that this presumption was intended to excuse CEQA's requirement to *discuss* potentially significant environmental effects. The guideline sets forth a standard for significance, but it does not govern the initial choice of environmental effects to be discussed. There is independent value in the discussion, regardless of the ultimate determination of significance. (See *Protect Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1108–1109 (*Amador Waterways*) ["notwithstanding compliance with a pertinent threshold of significance, the agency must still consider any fair argument that a certain environmental effect may be significant"].) Further, and in any event, Guidelines section 15064.3, subdivision (b), does not create a conclusive presumption of significance. As the Guideline states, it is "[g]enerally," not invariably, applicable.

In sum, we reject the Regent's assertion that project-generated effects on transit ridership, capacity, and delay are "outside the scope of the CEQA analysis." The EIR should have discussed these transit impacts and addressed whether they were significant. (*Amador Waterways*, *supra*, 116 Cal.App.4th at p. 1109.) If the Regents found transit impacts not to be significant, the EIR should have briefly stated the reasons for so finding.

29

(*Ibid.*; § 21100, subd. (c).) If transit impacts were found to be significant, the EIR should have discussed mitigation measures to minimize the impacts. (§ 21100, subd. (b)(3).) That no such discussion is found in the EIR, at least not in any organized, transit-focused section of the document, means the Regents fell short of their legal obligation to "proceed in the manner CEQA provides," an abuse of their discretion. (See *Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

We conclude, however, that the error was not prejudicial because the EIR, taken as a whole, includes sufficient information to inform "the public and decision makers of substantial relevant information about the project's likely adverse impacts" on public transit. (*Smart Rail*, *supra*, 57 Cal.4th at p. 463.) The body of the EIR describes baseline conditions in a manner that includes transit; it describes project-induced changes to the number and type of trips expected to and from the campus, and changes to the availability of parking and loading spaces; and it discusses how the Plan is consistent with various transit policies. The transportation appendix to the EIR quantifies expected traffic congestion and discusses qualitatively the possibility that this congestion will lead to transit delays during periods of peak travel. And the final EIR explains that new transit riders will be distributed among four transit routes in the immediate vicinity of the campus, with no "requirement of additional or expanded transit infrastructure . . . identified based on these new riders."

Focusing on transit delays, petitioners YB fault the EIR for failing to set forth a significance standard, assess impacts with reference to that standard, and propose feasible mitigation measures in the event project-induced transit delays are found to be significant. Although we acknowledge the centrality of a determination of significance in an EIR's discussion of

30

environmental impacts, we find the EIR's failure to engage in such an analysis to be harmless here, for reasons peculiar to the assessment of transit impacts in "transit priority areas." (§ 21099, subd. (b)(1).) These are areas "within one-half mile of a major transit stop" (§ 21099, subd. (a)(7)), which includes the Parnassus campus.

To encourage "transit-oriented infill development consistent with the goal of reducing greenhouse gases," the Legislature enacted section 21099. (*Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 725 (*Covina Residents*).) This legislation calls on OPR to propose revisions to CEQA guidelines that "establish[] criteria for determining the significance of transportation impacts of projects within transit priority areas." (§ 21099, subd. (b)(1).) Pursuant to this mandate, OPR issued extensive guidance on evaluating transportation impacts, making three main points: (1) lead agencies should consider whether a project blocks access to a transit stop or otherwise interferes with transit functions, and should promptly consult with transit agencies; (2) "lead agencies generally should not treat the addition of new transit users as an adverse impact," since adding riders to a transit system may slow transit vehicles but may also enhance transit availability and regional vehicle flow; and (3) the cumulative effects of increased demand may require new transit infrastructure, the costs of which may be allocated across a region.[5] (Technical Advisory, *supra,* at p. 19.)

_____

[5] We set forth here the entirety of OPR's guidance on assessing CEQA "Impacts to Transit":

"Because criteria for determining the significance of transportation impacts must promote 'the development of multimodal transportation networks' pursuant to Public Resources Code section 21099, subd. (b)(1), lead agencies should consider project impacts to transit

31

In light of OPR's guidance, we conclude that the EIR's truncated discussion of transit impacts meets the minimum requirement for an informational document, even without a detailed analysis of transit delays. First, the EIR's transit appendix is evidence that the Regents did consider whether the Plan would result in blocking access to transit stops or otherwise interfering with transit; it reports, based on traffic modeling, that congestion may periodically block access to transit stops or delay transit vehicles. But the Legislature has directed that "a project's effect on automobile delay shall not constitute a significant environmental impact" (Guidelines, § 15064.3, subd. (a)), and transit delays resulting from automobile delays may

systems and bicycle and pedestrian networks. For example, a project that blocks access to a transit stop or blocks a transit route itself may interfere with transit functions. Lead agencies should consult with transit agencies as early as possible in the development process, particularly for projects that are located within one half mile of transit stops.

"When evaluating impacts to multimodal transportation networks, lead agencies generally should not treat the addition of new transit users as an adverse impact. An infill development may add riders to transit systems and the additional boarding and alighting may slow transit vehicles, but it also adds destinations, improving proximity and accessibility. Such development also improves regional vehicle flow by adding less vehicle travel onto the regional network.

"Increased demand throughout a region may, however, cause a cumulative impact by requiring new or additional transit infrastructure. Such impacts may be adequately addressed through a fee program that fairly allocates the cost of improvements not just to projects that happen to locate near transit, but rather across a region to all projects that impose burdens on the entire transportation system, since transit can broadly improve the function of the transportation system."

(Technical Advisory, *supra*, at p. 19.)

32

reasonably be seen as falling within the ambit of this rule. Second, OPR directs that new transit users generally should not be considered an adverse impact. Similarly, Guideline section 15064.3, subdivision (b) instructs that projects near transit stops generally "should be presumed to cause a less than significant transportation impact." These authoritative interpretations of CEQA excuse the Regents' decision not to quantify transit delays, as such delays would be, almost by definition, less than significant. And third, the final EIR discloses, in the form of a comment letter from the City, that if the university were a private developer with a project of this scope, it would be assessed a Transit Sustainability Fee of about $30 million as its contribution toward the cost of increased transit infrastructure and service. This is a measure of the cumulative effects of increased transit demand, and the fact that the City was able to calculate the amount based on information provided in the draft EIR demonstrates that the EIR adequately served its role as an informational document.

The EIR's discussion of transit impacts is spartan, a result of the Regents' mistaken conclusion that transit operations were beyond the scope of a proper CEQA analysis. But in light of the approach to analyzing transit impacts in a transit priority area that the Legislature, the Guidelines, and OPR's Technical Advisory prescribe, we conclude that the EIR's discussion is adequate, and the Regents' error was not prejudicial. (*Smart Rail*, *supra*, 57 Cal.4th at pp. 464–465 [agency's failure to analyze effects on traffic congestion and air quality "did not deprive agency decision makers or the public of substantial information relevant to approving the project, and is therefore not a ground for setting that decision aside"].)

33

### C. Analysis of Effect of Transit Delay on VMT

Petitioners YB also argue that the EIR's discussion of the Plan's impact on VMT is inadequate because it "fails to analyze transit delay's indirect impact on VMT." This argument relies on the speculative assumption that implementation of the Plan will lead to the transit system being overwhelmed and transit users will resort to private automobiles instead. We find substantial evidence in the record supporting the EIR's contrary conclusion, that the percentage of trips that regular users of the campus will take on public transit will remain largely unchanged under the Plan. Specifically, the transit delay forecast in the EIR's appendix results from traffic delays on major thoroughfares near campus, which means commuters frustrated at the pace of public transit will have little incentive to abandon transit for also slow-moving private vehicles. And, as the OPR Technical Advisory points out, adding riders to transit systems can actually result in *improving* public transit service. (Technical Advisory, *supra*, at p. 19.) Finally, we note that even if the EIR is wrong about transit retaining its share of trips, that would not make the Plan's effects on VMT significant. If a displacement effect were to cause some additional increase in VMT at the expense of transit, VMT impacts would remain less than significant under the Plan because VMT as forecast in the EIR falls far short of the threshold of significance; there is plenty of margin for error.

### IV. Noise

Petitioners YB fault the EIR's analysis and mitigation of the noise that will be created by construction activities on campus. Specifically, petitioners contend (1) the EIR's discussion of noise impacts fails to correlate construction noise with impacts on human health, and (2) details of a noise

mitigation measure are improperly deferred. We find no CEQA violation in the EIR's treatment of noise impacts.

### A. Discussion of Noise Impacts on Health

Petitioners YB's criticism that the EIR fails to correlate noise impacts to human health relies on *Sierra Club, supra,* 6 Cal.5th at p. 520. *Sierra Club* considered a program EIR for a planned development community, and the question was whether the EIR's discussion of air quality effects was adequate. (*Id.* at p. 507.) The EIR discussed the health impacts of various air pollutants. For ozone, it identified concentrations, expressed in parts per million, at which listed symptoms were triggered by pollutants. (*Id.* at p. 519.) But the EIR did not describe the quantity of ozone generated by the project in parts per million; it instead disclosed the tons per year emitted of two precursor pollutants that together, when reacting with sunlight, form ozone. (*Id.* at p. 520.) As a result, the information provided by the EIR did not permit a reader to connect the ozone emissions of the project to their likely health impact. And the EIR was even less informative for other pollutants whose triggering concentrations were not disclosed at all. As *Sierra Club* summarized its holding, "CEQA requires that the EIR have made a reasonable effort to discuss relevant specifics regarding the connection between two segments of information already contained in the EIR, the general health effects associated with a particular pollutant and the estimated amount of that pollutant the project will likely produce . . . . Because the EIR as written makes it impossible for the public to translate the bare numbers provided into adverse health impacts . . . the EIR's discussion of air quality impacts in this case was inadequate." (*Id.* at p. 521.) In *Sierra Club*, the EIR failed the ultimate test of providing "enough detail 'to enable those who did not participate in its preparation to understand and to

35

consider meaningfully the issues raised by the proposed project.' " (*Id*. at p. 516.)

We find no similar flaw in this EIR's discussion of noise impacts. As an outline for development on campus, the Plan necessarily anticipates a series of noisy construction projects. The EIR's discussion of construction noise begins with an explanation of the measurement and physics of noise, including a table quantifying the intensity of noise generated by various sources—from rustling leaves to a jet engine—as measured in decibels 50 feet from the source. It then describes the health effects of environmental noise, reports on current levels of ambient noise on campus, and identifies the location of "sensitive receptors," such as schools and homes, near the planned construction. The discussion of health effects describes in general terms the impact of noise at various decibel levels, including thresholds at which noise disturbs sleep, "seriously annoy[s]" those who are awake, interferes with human speech, or damages hearing.

In analyzing the environmental impact of the Plan's construction noise, the EIR describes the noise level to be expected from typical types of construction equipment, measured at distances of both 50 and 100 feet. It then maps this information into an extensive table listing the daytime noise levels to be expected at various locations from construction anticipated in the initial phase of the Plan, with the exception of the New Hospital. Despite the adoption of various noise control practices as mitigation measures, the EIR finds that the Plan would generate "a substantial temporary increase in ambient noise levels in the vicinity of the construction project in excess of standards established" by the City and, for that reason, concludes that the impact of noise would be significant and unavoidable, despite the implementation of proposed mitigation measures.

36

As this summary suggests, the EIR contains a wealth of information about the daytime noise levels to be expected from the Plan's projects, expressed in decibels perceived at a specified distance from the source. Because noise levels decrease with distance, this is an appropriate and meaningful means of presenting such information. The EIR also discusses various health effects that can occur as a result of different levels of noise, again expressing several of these in decibels. On the basis of this information, possible effects of any given source of noise can be determined, once the relative locations of the source and the receptor are known. While more could always have been written, this information provides "enough detail 'to enable those who did not participate in [the EIR's] preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 516; see *Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 107–108 [finding similar discussion of noise impacts adequate].) Because the health impact of noise pollution is highly dependent on the precise location and nature of the receptor, it would be unreasonable to require more.

### B. Deferral of Mitigation Details

Petitioners YB also contend that a measure adopted to mitigate the impact of noise from construction activities is unenforceable and constitutes "impermissibly deferred mitigation." We disagree.

The EIR's mitigation measure for construction noise is in three parts. Two of these seek to reduce noise by regulating the equipment used and the location of noise-generating activities. The challenged part, Mitigation Measure NOI-1b, limits the hours of construction. Measure NOI-1b allows work to be performed between 7:00 a.m. and 5:00 p.m. on weekdays, unless the project manager gives advance notice to the UCSF Community and

37

Governmental Relations office, in which case work can continue until 8:00 p.m. on weekdays and occur between 8:00 a.m. and 5:00 p.m. on weekends. This schedule is further constrained for noisy work—that generating more than 80 decibels at 100 feet. But in "rare circumstances" when work "need[s] to occur outside of these work hour limits," Mitigation Measure NOI-1b allows it.

Petitioners YB's concern is that the "rare circumstances" that will permit work outside the permitted hours are not specified in the mitigation measure. However, that the mitigation measure lacks specificity in one regard does not mean that its details have been deferred. Perfection in the formulation of mitigation measures is not required. (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 696 (*Downtown Plan*).) The EIR specifies that circumstances justifying the exception will be "rare," only when work "need[s] to occur outside of" specified hours, suggesting a requirement of good cause intrinsic to the nature of the construction activity. This is sufficient to give the university, the construction contractors, and the public a basis for implementing the mitigation measure.

Petitioners rely on *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814 (*King & Gardiner*) in contending that the mitigation measure is inadequate, but the circumstances of that case bear little resemblance to the university's noise mitigation measure. The mitigation measure in *King & Gardiner* stated, " 'Applicant shall *increase* the re-use of produced water and shall *reduce* its use of municipal and industrial quality ground or surface water *to the extent feasible*,' " which the court found too vague to satisfy CEQA. (*Id*. at pp. 855, 858.) Mitigation Measure NOI-1b, in contrast, specifies authorized hours of construction. Even the language

38

allowing an exception in "rare circumstances" establishes a clearer standard than the relative terms "increase" and "reduce," found in the *King & Gardiner* mitigation measure.

## V. Toxic Air Contaminants

Petitioners YB contend that the EIR understates the significance of the Plan's health risks from the emission of toxic air contaminants (TACs), arguing that the EIR "piecemeals various emission sources and thereby fails to identify the overall cancer risk . . . resulting from the combined emissions from all Project emissions." Stated differently, petitioners YB contend that the EIR avoids finding that the environmental impact of the Plan's TAC emissions is significant by improperly applying the thresholds of significance. We are unpersuaded.

The EIR's chosen thresholds of significance for TAC emissions are based on the emissions' likely health impact. TACs are a class of air pollutants subject to local, rather than federal, regulation by the Bay Area Air Quality Management District (BAAQMD). The EIR adopts significance thresholds set by BAAQMD's guidelines, under which TAC emissions are deemed significant if (1) an individual project would result in 10 or more cancer cases per one million persons exposed over a lifetime, or (2) cumulative TACs impacts would result in 100 cancer cases per million exposed persons. (See BAAQMD CEQA Air Quality Guidelines (May 2017) § 2 & Table 2-1, at p. 2-2 (BAAQMD 2017 CEQA).)

In assessing emissions against these thresholds, the EIR analyzes three separate sources of TAC emissions: (1) emissions from construction activities anticipated in the initial phase of the Plan, (2) operational emissions from buildings other than the New Hospital constructed in the initial phase of the Plan, and (3) operational emissions from the New

39

Hospital and all emissions from remaining activities of the Plan. The EIR concludes that TAC emissions from the construction of each of the initial-phase projects would be significant, and it proposes measures to reduce these emissions below the threshold of 10 cancer cases per million. In evaluating TAC emissions from the operation of initial-phase buildings excluding the New Hospital, the EIR considers only the Research and Academic Building because operation of the remaining buildings will not generate significant TACs. The EIR finds cancer risks from these operations to be minimal and not significant. TAC emissions from operation of the New Hospital and construction and operation of the remaining development anticipated by the Plan are analyzed only as cumulative impacts. Assuming implementation of the proposed mitigation measures, the EIR finds cumulative impacts to be less than significant when judged against the BAAQMD's standard of 100 new cancer cases per million exposed persons.

When the CEQA statute and Guidelines do not establish a threshold for significance of an environmental impact, "it is the responsibility of lead agencies to choose the thresholds of significance to be applied." (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 884.) The Guidelines "recognize that an agency's adoption of a threshold of significance requires an exercise of reasoned judgment" and an agency's choice "will be upheld if founded on substantial evidence." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 206 (*Mission Bay*).)

Petitioners YB first contend that the EIR's conclusion that mitigated TAC emissions from construction of the initial-phase projects will not be significant was erroneous because the analysis did not include all TAC emissions. The claim, however, is premised on a misunderstanding of the EIR's application of the BAAQMD threshold for significance. In making their

40

argument that mitigated TAC emissions are "very close to the applicable significance standard of ten," petitioners sum the TAC emissions from all four of the initial-phase projects, assuming that the threshold applies to the projects jointly.  The BAAQMD threshold of significance of 10 cases per million persons, however, is intended to be applied to an "Individual Project." (BAAQMD 2017 CEQA, *supra*, § 2 & Table 2-1, at p. 2-2.)  That phrase is ambiguous because it could refer either to a CEQA "Project," that is, the subject of an EIR, or more generally to an individual construction project. The EIR elects to apply the threshold individually to each of the four initial-phase construction projects.  Applying the threshold in this manner was well within the Regents' discretion and is supported by substantial evidence. (*Mission Bay*, *supra*, 6 Cal.App.5th at p. 206.)  These are discrete construction projects.  One of the four is the New Hospital.  Two others are the Research and Academic Building and the new housing.  We see no reason all of these, plus the fourth project, must be considered as a single project, especially since the largest contribution comes from the New Hospital, which will be the subject of a separate project-level EIR.

With that understanding, the individual excess cancer risks to an "Offsite Receptor" from TAC emissions during construction for the four projects are 0.67, 1.17, 2.91, and 4.72.  Each of these is less than half of the project threshold of 10, and petitioners provide no evidence to suggest that the purportedly omitted sources of TACs would raise the risk of any of these projects to 10 or above.  Petitioners therefore provide no reason to doubt the EIR's conclusion that mitigated TAC emissions from construction of the initial-phase projects will not cause a significant environmental effect.

Petitioners YB argue that applying the significance threshold to the buildings individually was improper because "nowhere does UC claim that

these various construction activities have independent utility." "Independent utility," like the concept of "piecemealing" also invoked by petitioners, is a term of art used in connection with an applicant's decision to engage in CEQA analysis of a particular project in isolation, rather than as part of a larger plan of which it is a part. (See *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 237.) In general, two activities must be analyzed in the same EIR, as part of the same CEQA project, if they are "linked in a way that logically makes them one project, not two." (*Make UC A Good Neighbor v. Regents of the University of California* (2023) 88 Cal.App.5th 656, 683 (*Good Neighbor*), review granted, May 17, 2023, S279242.)[6] "But two projects may be kept separate when, although the projects are related in some ways, they serve different purposes or can be implemented independently"—i.e., have independent utility. (*Good Neighbor*, at p. 684.) As this explanation makes clear, the concept of independent utility has no direct application to the adoption and application of thresholds of significance. Whether two activities should be analyzed in the same EIR is a distinct issue from how the significance of their environmental impact should be assessed. But in any event, we have no trouble discerning independent utility in a hospital, a research building, and a housing project. We thus find no error in the Regents' application of the BAAQMD thresholds separately to each of four initial-phase construction projects.

---

[6] Pursuant to California Rules of Court, Rule 8.1115, subdivision (e)(1), a published Court of Appeal case pending Supreme Court review "has no binding or precedential effect, and may be cited for potentially persuasive value only." We cite *Good Neighbor*, *supra*, 88 Cal.App.5th 656 for its persuasive value here.

Petitioners YB raise a similar claim with respect to operational TAC emissions from the initial-phase projects, contending that the impact of TAC emissions should have been found significant because (1) the EIR was required to combine construction and operational emissions in applying the threshold and (2) operational emissions should have included TAC emissions resulting from the additional vehicle trips that will result from persons using the new buildings. As to the first argument, we note the BAAQMD thresholds independently address emissions during construction and operation, and we are skeptical of petitioners' argument since construction and operation of any one building will not occur at the same time. But in any event, we note that only the Research and Academic Building is anticipated to produce significant operational TAC emissions. Summing its construction and operational risks results in an excess cancer risk of 3.17, far short of the significance threshold of 10. Combining construction and operational TAC emissions therefore would not have changed the EIR's finding that mitigated TAC emissions are not significant.

As to the second argument, we agree with petitioners YB that the calculation of risks from operational TAC emissions should have included emissions resulting from additional vehicle trips that will be generated by the Plan, but we are not persuaded that including these emissions would have pushed new cancer cases beyond the threshold of significance. The EIR estimates that the Plan will result in 28,800 additional daily vehicle trips. Only a portion of those trips will be attributable to initial-phase projects other than the New Hospital—that is, to the portion of the Plan's anticipated development for which the EIR analyzes operational emissions. Sixty percent of the new trips are by patients and visitors; most of these are presumably persons using the New Hospital, the primary new clinical

building.  The remaining 12,300 anticipated new trips are mostly taken by faculty, staff, and students, though some are by residents.  We find in the EIR no evidence directly addressing the health impact of these trips, but the EIR does provide evidence that allows us to understand the order of magnitude for the increased cancer risk they cause.  The EIR estimates that traffic on Parnassus Avenue, which bears more than 10,000 vehicles a day, is responsible for an increased cancer risk of 0.9 per one million persons.  Even if we generously assume that all 12,300 of the new trips not associated with patients and visitors are associated with the initial-phase project that already entails the highest increase in cancer risk from operations, the Research and Academic Building, they do not cause the increased cancer risk from this building project to exceed the 10 per one million threshold.  One can double or triple (or even double and then triple) 0.9 per one million and add it to the increased cancer risk of 0.26 associated with operations at the Research and Academic Building, and the result still leaves the risk well below 10 per one million.  This is true even if, as petitioners contend is appropriate, the operational and constructional risks are combined.  Thus, the omission of new vehicle trips from the EIR's analysis of TACs did not affect the EIR's conclusion that such impacts are not significant.

We further find no error in the EIR's decision to analyze the remaining TAC emissions only as cumulative impacts.  These emissions are associated with future projects that will, at an appropriate time, be the subject of individual project EIRs.  Given the uncertainty surrounding the precise nature of their impacts and the university's obligation to evaluate them under the project EIR standard in the future, we find the Regents' decision to evaluate them only as cumulative impacts and to apply the significance threshold applicable to such impacts to be supported by substantial evidence.

44

## VI. Greenhouse Gas Emissions

Petitioners YB contend that a measure providing for the purchase of carbon offset credits to mitigate greenhouse gas (GHG) emissions is unenforceable, and its details improperly deferred. Petitioners rely largely on *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467 (*Golden Door II*), which considered a less effective mitigation measure. We conclude the challenged mitigation measure here is adequate.

Over time, the Plan will increase consumption of carbon-based energy on campus, potentially resulting in a substantial increase in GHG emissions. Given the incremental contribution of all GHG sources to climate change, the EIR concludes that the Plan would have a significant environmental effect if it causes *any* net increase in the campus's GHG emissions. To avoid this result, the EIR adopts three mitigation measures. The first two specify operational measures to reduce GHG emissions. The third, Mitigation Measure GHG-1c, requires the university to monitor campus GHG emissions and, if other measures fail to hold GHG emissions below net zero, to purchase carbon offset credits (offsets) to the extent emissions "exceed the . . . campus's baseline emissions . . . in 2018." Although the purchase of offsets is expressly authorized as a means of mitigating GHG emissions under CEQA (Guidelines, § 15126.4, subd. (c)(3)), the ephemeral nature of offsets can create problems of enforcement.

The concept of offsets grew out of the cap-and-trade system for limiting GHG emissions, under which each GHG emitter is granted an emissions allowance. (*Golden Door II*, *supra*, 50 Cal.App.5th at p. 485.) An emitter that does not use its entire allowance may sell the excess to an emitter that would otherwise exceed its cap. In this way, "GHG emitters may comply with the cap by purchasing GHG reductions that others achieve, called

45

offsets." (*Ibid*.) Offsets are effective in mitigating GHG emissions, however, only if the offsets reflect genuine reductions in GHG emissions. As *Golden Door II* explained, " '[U]nlike the produce at the farmer's market, we can't examine the [GHG offset] product to determine its value. Not only are emission reductions invisible, they actually *didn't happen*. So to have confidence in their value, we need a reliable and accurate picture of what *would have happened*, as well as what *actually happened*.' " (*Id*. at p. 507.) That confidence is provided by " '[p]rotocols,' " which are " 'formalized procedures for accounting for credits that ensure the credits are an accurate and reliable representation of emission reductions that actually occurred.' " (*Id*. at pp. 507–508.)

The California Air Resources Board (CARB) is responsible for "monitoring and regulating sources of emissions of greenhouse gases . . . in order to reduce emissions." (Health & Saf. Code, § 38510.) In that role, CARB has developed offset protocols for use in the state's cap-and-trade program. To qualify, offsets must satisfy regulations designed to ensure that the "emission reduction achieved is 'real, permanent, quantifiable, verifiable, enforceable, and additional to any GHG emission reduction otherwise required by law or regulation, and any other GHG emission reduction that otherwise would occur.' " (*Golden Door II, supra*, 50 Cal.App.5th at p. 506, quoting Health & Saf. Code, § 38562, subds. (d)(1) & (2).) The CARB protocol regulations are the gold standard for ensuring offsets constitute genuine GHG mitigation.

CEQA mitigation measures must be "fully enforceable." (Guidelines, § 15126.4, subd. (a)(2).) *Golden Door II* considered whether a mitigation measure the County of San Diego adopted for controlling GHGs met this requirement. The measure was part of the county's climate action plan and

46

called for the purchase of offsets.  (*Golden Door II*, *supra*, 50 Cal.App.5th at p. 482.)  The county contended the mitigation measure was comparable to CARB-issued offset credits, but the court concluded it fell short of CARB standards in three respects that rendered it unenforceable.  (*Id.* at pp. 506– 507.)  First, although the measure set standards for the registries from which offsets could be purchased, it did not also require that those registries use protocols that CARB had approved.  (*Id.* at pp. 511–512.)  Second, where CARB requires government approval of any offset credits generated outside California, the mitigation measure contained no similar safeguard for out-of-state, in particular internationally sourced, offsets.  (*Id.* at pp. 512–513.)  Finally, CARB requires offsets to reflect GHG reductions that are "additional" to those otherwise required by law or generated in the ordinary course, and the mitigation measure contained no requirement of additionality.  (*Id.* at pp. 513–515.)  On the basis of these departures from CARB standards, the court found the GHG mitigation measure unenforceable.  Petitioners YB raise similar concerns about the provisions of Mitigation Measure GHG-1c.

Mitigation Measure GHG-1c is in two sections.  The first section requires UCSF to purchase CARB-approved offset credits as part of its participation in California's cap-and-trade program.  Although this aspect satisfies *Golden Door II*, it applies only to emissions from the university's utility plant, and allows only a small fraction of these to be addressed through offset purchases.  To the extent meeting the Plan's net zero goal requires additional offsets, the second section of the mitigation measure requires carbon offsets purchased in the "voluntary carbon offset market." These purchases will be pursuant to "internal guidelines" the Carbon Neutrality Initiative of the University of California has developed to ensure

47

offsets "result in additional, verified GHG emissions." Consistent with these internal guidelines, offsets will be "verified by a major registry recognized by CARB." Out-of-state offsets will be purchased only if sufficient local and in-state offsets are unavailable, and there is no provision for international offsets. Further, "[t]he protocols of each registry, and UC['s] own internal screens, shall be used to demonstrate that the carbon offset credits provided are real, permanent, additional, and have been independently verified as adhering to its applicable project protocols."

This measure does not suffer from the same deficiencies as the mitigation measure in *Golden Door II*. At least some of the offsets purchased here will be directly governed by CARB cap-and-trade regulations. The remainder will be purchased according to preexisting University of California guidelines that, like CARB's cap-and-trade regulations, are designed to ensure the offsets are "real, permanent, [and] additional." Although the protocols for these offsets will not necessarily have been approved by CARB, the EIR expressly states that the protocols will be examined to ensure the validity of the offsets. Out-of-state offsets will be used only as a last resort, and offsets will not be sourced internationally. In short, this mitigation measure addresses the concerns of the *Golden Door II* court.

Petitioners YB object that Mitigation Measure GHG-1c does not meet the "same enforceability standard as CARB's cap and trade program." But CEQA does not require that all GHG mitigation measures satisfy CARB standards. *Golden Door II* relied on CARB standards as exemplary, but did not purport to require them. *Golden Door II* applied CARB's cap-and-trade standards in that case because the mitigation measure before it "self-imposes these requirements." (*Golden Door II, supra,* 50 Cal.App.5th at p. 507, fn. 21.) For us to impose the same standards would, in the absence of a

48

statutory or administrative requirement, be inconsistent with our standard of review: "We review the EIR's discussion of mitigation measures by the traditional substantial evidence standard. It is not our task to determine whether adverse effects could be better mitigated." (*Downtown Plan*, *supra*, 102 Cal.App.4th at p. 696.)

Petitioners YB also contend that the details of Mitigation Measure GHG-1c are impermissibly deferred, again relying on *Golden Door II*. The mitigation measure before us, however, contains none of the subjective or absent standards on which the *Golden Door II* court relied in finding improper deferral. (*Golden Door II*, *supra*, 50 Cal.App.5th at pp. 518–525.) Petitioners fault the EIR for ostensibly failing to describe the internal University of California guidelines that will be used in purchasing offsets, but petitioners ignore specifics about the guidelines that the EIR sets forth. We are not persuaded that a fuller account was necessary. The guidelines already exist, they implement a larger UC policy, and substantial evidence thus supports the conclusion that UCSF's implementation of this measure is not left to the unconfined discretion of university officials.

## VII. Marine Water Quality

The EIR discusses the Plan's impact on stormwater runoff and adopts—in response to petitioner SF's comments on the draft EIR—a mitigation measure intended to limit stormwater discharges. Unwilling to settle for this victory, petitioner SF here contends the EIR should have more fully discussed the environmental effects of stormwater discharges into the marine waters surrounding San Francisco, and that the new material in the final EIR fails to cure the problem. We disagree.

The draft EIR discusses the Plan's impact on hydrology and water quality, describing the City's system for collecting and treating sewage and

49

stormwater, as well as the federal, state, and local regulation of wastewater discharge. The discussion notes, in brief, that stormwater from the campus is collected by the university and discharged to the City's sewer system. The system conveys both sewage and stormwater runoff to two wastewater treatment plants. Because the City is "covered in impermeable surfaces," the treatment plants "can be overwhelmed" during storms, resulting in the discharge of minimally treated wastewater into San Francisco Bay.

With respect to stormwater, the EIR's water quality analysis states that 86 percent of the campus "core" already consists of impermeable surfaces, and development anticipated by the Plan would add about 4 percent to this total. The draft EIR concluded that this increment "would not substantively change" treatment of runoff, and that "site design measures" to minimize the increase in impervious surfaces would help limit "the offsite discharge of stormwater pollutants." Concluding the Plan would not "substantially degrade surface or groundwater quality," the draft EIR found no significant impact.

Petitioner SF's comments on the draft EIR caused the Regents to change course. Petitioner pointed out that the City's sewage treatment system had a long history of violations due to stormwater discharges, resulting in bacterial contamination of coastal waters and harming "beach water quality." In response, the final EIR acknowledges that "existing water quality in the Bay and the Ocean is negatively affected by wet weather discharges, and that condition is part of the CEQA baseline for evaluation of impacts." The EIR now states that the Plan *would* have potentially significant impact on water quality because "increases in stormwater volumes and wastewater volumes under the [Plan] could increase the volume or frequency of overflow events . . . in wet weather."

50

To address these potential impacts, the final EIR adopts Mitigation Measure HYD-1. This measure requires the university to reduce stormwater discharges from the campus "by an amount sufficient to offset flows from any increase in impervious surfaces and any increases in wastewater discharges as a result of the [Plan]." In short, the university commits to no new net flow during wet weather. There is an exception, "if modeling demonstrates there is sufficient storage, pumping, and treatment capacity in the City's [system] to avoid increased discharges" into marine waters. And there are details, for example, about the required modeling, timing, and funding for any capacity improvements. With the adoption of this measure, the final EIR assesses the Plan's effects on water quality as less than significant.

### A. Discussion of Water Quality

Petitioner SF first contends that the EIR's discussion of the Plan's potential impact on beach water quality is inadequate because it fails to describe (1) "San Francisco's degraded beach water quality" and (2) "the dysfunctional regulatory system governing San Francisco's sewage treatment plants."

In reviewing the adequacy of an EIR's discussion of environmental impacts, "[t]he ultimate inquiry . . . is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Sierra Club, supra*, 6 Cal.5th at p. 516; see Guidelines, § 15151.) "[W]e do not require technical perfection." (*Sierra Club*, at p. 515.) We are persuaded that the EIR's discussion of stormwater impacts contains sufficient information to meet CEQA standards.

The EIR discusses the circumstances under which stormwater discharges into coastal waters, and it addresses the risk that changes

51

anticipated by the Plan might increase these discharges. The EIR recognizes that stormwater during construction could contain "oil, grease, gasoline, brake fluid, antifreeze, or other vehicle-related fluids and pollutants," while stormwater from operations could "contain pollutants common in urban runoff, including metals, oils and grease, pesticides, herbicides, nutrients, pet waste, and garbage/litter." The threat posed by the untreated release of these materials into the sea is clear. More information about the specific nature of the pollution of coastal waters was unnecessary to an understanding of the problem.

Petitioner SF characterizes the regulatory system governing operation of the City's sewage treatment as "dysfunctional," but this contention relates less to the nature of the system than to the City's failure to satisfy its obligations under it. The EIR's general description of the regulatory system governing wastewater is thorough, and details of the City's past noncompliance are not necessary " 'to understand and to consider meaningfully the issues raised by' " changes in water quality resulting from the Plan. (*Sierra Club*, *supra*, 6 Cal.5th at p. 516.)

Petitioner SF also contends that the draft EIR improperly relies on "ratio theory," apparently referring to the draft EIR's conclusion that the Plan's small increase in impervious surfaces precludes a significant impact on water quality. The draft EIR does not expressly draw the conclusion suggested by petitioner, but in any event, the final EIR's acknowledgment of a potentially significant impact on water quality effectively moots this contention.

## B. *Recirculation*

Petitioner SF argues that the Regents' revision of the EIR in response to comments required its recirculation. "An EIR must be recirculated if

'significant new information' is added after issuance of the draft EIR." (*East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1265 (*East Oakland*).) And if an agency decides not to recirculate, that decision must be supported by substantial evidence. (See *Ibid.*; Guidelines, § 15088.5, subd. (e).)

We conclude that substantial evidence supports the Regents' decision not to recirculate here. The primary changes to the discussion of hydrology and water quality are the reclassification of the Plan's impact from not significant to potentially significant and the adoption of a mitigation measure requiring the university to ensure there is no net increase in stormwater discharges. Guidelines section 15088.5, subdivision (a), states that new information is not significant "unless" the change deprives the public of an opportunity to comment upon a "substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect . . . that the project's proponents have declined to implement." (*Id.*, subd. (a).) The Plan was not changed in a manner that increased its environmental impact, and no new environmental impact, let alone a substantial impact, was disclosed. On the contrary, the information relating to the environmental effect was included in the original EIR, thereby permitting the public (including petitioner SF) to comment on it. Nor did the Regents decline to implement a proposed mitigation measure. The Regents were simply persuaded that the impact of the Plan's increase in sewage flow and impermeable surface, which they originally found not significant, should be considered potentially significant and deserving of mitigation.

Petitioner SF urges us to review de novo the Regent's decision not to recirculate, contending the "draft EIR was so fundamentally and basically inadequate and conclusory" as to deprive the public of the opportunity to

53

comment.  (Guidelines, § 15088.5, subd. (a).)  But we would reject the factual premise of this argument under any standard of review, and thus need not entertain this novel argument.

The parties have cited us to a variety of prior decisions; we find the Supreme Court's decision in *Laurel Heights Improvement Assn. v. Regents of the University of California* (1993) 6 Cal.4th 1112, most closely applicable.  In that decision, which concerned the construction of the university's Laurel Heights campus, the draft EIR did not include a discussion of the potential impact of the campus buildings' lights after dark.  In response to comments, the Regents included a discussion of the issue in the final EIR, concluded the lighting would not cause a significant impact because it would add " 'only incrementally' " to existing night lighting conditions, and adopted a mitigation measure nonetheless.  (*Id*. at p. 1140.)  The court rejected the claim that the effect was potentially significant and required recirculation, concluding the change was "an insignificant modification to the EIR that does not disclose a new adverse environmental impact."  (*Ibid*.)  The court noted the mitigation measure would not cause any additional adverse environmental effects, and that the Regents did not decline to adopt any suggested measures.  (*Id*. at p. 1141.)  Accordingly, "[n]one of the purposes of CEQA will be served by solicitation of further public comment on this subject; only needless delay will result."  (*Ibid*.)  The same is true here with respect to the Plan's impact on hydrology and water quality.

### C.  *Deferred Mitigation*

Petitioner SF contends that Mitigation Measure HYD-1 constitutes an improper deferral of the details of mitigation.  Under the Guidelines, an agency may not defer "[f]ormulation" of mitigation measures.  (Guidelines, § 15126.4, subd. (a)(1)(B).)  "The specific details of a mitigation measure,

however, may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure." (*Ibid*.; see *East Oakland, supra*, 89 Cal.App.5th at pp. 1254–1255.)

Petitioner SF contends Mitigation Measure HYD-1 improperly defers mitigation "because setting a goal, even a no net increase goal, unsupported by evidence that it is feasible to achieve the goal is not a 'performance standard.'" The decision on which petitioner relies for that principle, *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, featured a distinctly different mitigation measure. The *POET* court concluded that a state agency's commitment to test biodiesel fuels and then engage in "'rulemaking to establish specifications to ensure there is no increase in $NO_x$'" failed to articulate a specific performance criterion. (*Id*. at p. 739.) It was unclear, the *POET* court explained, "what tests will be performed and what measurements will be taken to determine that biodiesel use is not increasing $NO_x$ emissions." (*Id*. at p. 740.)

Mitigation Measure HYD-1 suffers no such infirmities. It sets forth the specific model to be used in assessing stormwater flows, clarifies that improvements constructed off-campus or in public rights of way must be included in the calculations, and establishes a schedule for baseline and regular follow-up testing. Further, it specifies several means to achieve any necessary reductions. We will, accordingly, follow *East Oakland* in concluding that this "net-zero" goal is a satisfactory performance standard

55

and quite "[u]nlike the proposed regulations in *POET*." (*East Oakland*, *supra*, 89 Cal.App.5th at pp. 1257, 1259 [approving mitigation measure to ensure no increase in GHG emissions].)

Petitioner SF also contends the mitigation measure is unenforceable because it has no "reporting processes providing a basis for enforcement review or enforcement action by anyone outside of UCSF." CEQA does not, however, require that enforcement of a mitigation measure be vested in a third party when a public agency is the project sponsor. On the contrary, although Guideline section 15126.4, subdivision (a)(2) states that mitigation measures must be "fully enforceable," it recognizes that "[i]n the case of the adoption of a plan . . . or other public project, mitigation measures can be incorporated into the plan, policy, regulation, or project design."

Petitioner also argues that there is no evidence the mitigation measure is feasible, citing the failure of current City efforts to prevent pollution by stormwaters. However, the "feasibility" standard is not addressed to mitigation of the underlying problem of ocean water contamination, but to the feasibility of meeting the performance standard established in the mitigation measure. The university is neither required nor expected to cure the city-wide problem of stormwater pollution.

## VIII.  Historic Buildings

Petitioner SF contends that the EIR improperly concludes it is not "feasible" to avoid the demolition of several historic buildings on campus. We are unpersuaded.

The Plan anticipates the demolition of at least eight structures. Several of these are eligible for listing in the state and/or national registers of historical resources. The buildings are considered historical resources not only because of their age, but also for their historical roles, architectural

56

significance, and artwork.  The EIR considers a Reduced Project alternative that would have preserved *all* of the architecturally significant buildings on the campus, but this alternative did not "fully achieve" the objectives of the Plan and ultimately was not chosen.

The EIR acknowledges that demolition of historically significant structures would be " 'a substantial adverse change' " that it judges to be both significant and unavoidable under the Plan, even with mitigation.  The EIR proposes mitigation measures that would create a digital record of the buildings but would not preserve the structures themselves.

Relying on the general principle that a lead agency may not "approve the project as proposed if there are feasible alternatives or mitigation measures that would avoid or substantially lessen the adverse environmental effects" (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 498; see § 21002), petitioner SF asserts that "the EIR's conclusion that it is infeasible to avoid demolishing" the buildings "is based on errors of law and is not supported by substantial evidence."  Petitioner appears to be arguing that it is "feasible" to avoid demolishing the buildings because a use was found for them in the 2014 LRDP; that is, preserving the buildings is feasible because they are not beyond repair.

The argument takes too narrow a view of the concept of "feasibility."  Petitioner SF ignores that the Plan's purpose in demolishing these historic buildings is to make room for new structures.  As the final EIR points out in responding to a comment raising this issue, this EIR "evaluates a different project than the 2014 LRDP EIR, with different objectives and different component parts."  We find that a sufficient response.

CEQA "defines a ' "[f]easible" ' mitigation measure as one that is 'capable of being accomplished in a successful manner within a reasonable

period of time, taking into account economic, environmental, social, and technological factors.' " (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 363.) Given this broad definition, feasibility is ultimately a policy judgment, not a narrowly technical assessment, and one we must review with deference. (See, e.g., *Native Plant Society*, *supra*, 177 Cal.App.4th at p. 1001.) An EIR is not required to adopt a mitigation measure or alternative simply because doing so would reduce a significant impact. After all, it is always possible to eliminate a project's significant environmental effects by cancelling whatever aspect of the project causes that environmental effect.

Here, the impact on historic buildings could be eliminated by canceling the portions of the Plan that require their demolition. But, "an alternative that 'is impractical or undesirable from a policy standpoint' may be rejected as infeasible.' " (*Native Plant Society*, *supra*, 177 Cal.App.4th at p. 1001.) As the Regents demonstrated in rejecting the Reduced Project alternative and adopting a statement of overriding considerations with respect to the significant, unmitigated impact on cultural resources that will result from the Plan's demolition of these buildings, the Regents deem the erection of buildings better suited to the demands of modern medical research and treatment to outweigh the cultural impact of the loss of the older buildings. Setting that priority is, of course, the Regents prerogative under CEQA. (*Id.* at p. 982 ["Under CEQA, 'a public agency is not required to favor environmental protection over other considerations' "].)

IX. **Toxic Air Contaminants—Thresholds of Significance**

Petitioner SF argues the EIR errs in using thresholds for significance for impacts to air quality that (1) the Regents did not adopt through a formal

58

rule-making process and (2) consider only new cases of cancer, not existing cancer risk.  We find no merit to either contention.

### A. BAAQMD Thresholds

As discussed in Section V. above, the EIR adopts thresholds for air quality impacts from CEQA Guidelines published by the BAAQMD.  The EIR notes that "[t]hese thresholds are based on substantial evidence identified in Appendix D" to the BAAQMD Guidelines, a document that, in turn, references analysis by the United States Environmental Protection Agency (EPA).

Petitioner SF contends, citing *Golden Door Properties*, *LLC v. County of San Diego* (2018) 27 Cal.App.5th 892, 903 (*Golden Door I*), that the EIR's adoption of the BAAQMD significance thresholds was invalid because a lead agency must adopt such a threshold "by a public rule-making process, and must show in that process that the thresholds are supported by substantial evidence."

Petitioner is mistaken.  The CEQA Guidelines permit a lead agency to use thresholds established by other agencies:  "When adopting or using thresholds of significance, a lead agency may consider thresholds of significance previously adopted or recommended by other public agencies . . . , provided the decision of the lead agency to adopt such thresholds is supported by substantial evidence."  (Guidelines, § 15064.7, subd. (c).) Petitioner does not argue that the adoption of the BAAQMD standard was not adequately supported.

*Golden Door I*, *supra*, 27 Cal.App.5th 892, is not to the contrary because it addresses a different situation.  The lead agency in *Golden Door I*, a county, had established a threshold for significance of GHG emissions to be used generally in EIRs prepared by the county.  Adoption by a lead agency of

a threshold for *general* use—that is, for use in all EIRs for which the agency acts as a lead agency—is governed by Guidelines section 15064.7 and does require an "ordinance, resolution, rule, or regulation . . . developed through a public review process." (Guidelines, § 15064.7, subd. (b); see *Golden Door I*, at pp. 897–898.) The same subdivision, however, recognizes that "[l]ead agencies may also use thresholds on a case-by-case basis" (Guidelines, § 15064.7, subd. (b)) and does not require a formal process for adoption of such thresholds. Recognizing the difference, *Golden Door I* expressly distinguishes a case, *Save Cuyama Valley v. County of Santa Barbara* (2013) 213 Cal.App.4th 1059, that approved a threshold adopted through a case-by-case approach. (*Golden Door I*, at p. 903; see *Cuyama Valley*, at p. 1068 ["CEQA only requires that a threshold be formally adopted if it is for 'general use'—that is, for use in evaluating significance in all future projects"].) Petitioner suggests that the Regents adopted the BAAQMD standard for general use but provide no basis for the claim, and nothing in the EIR indicates that the Regents require the use of the BAAQMD threshold in all EIRs prepared by the University of California. Accordingly, the Regents were not required to engage in a formal rule-making process.

Petitioner SF argues alternatively that when a lead agency adopts a threshold established by another body under Guidelines section 15064.7, subdivision (c), that body must have adopted the threshold through a public process. Petitioner cites no authority for the claim, which is inconsistent with the authorization in section 15064.7, subdivision (c) for a lead agency to consider thresholds of significance "previously adopted or recommended by other public agencies *or recommended by experts*." (Italics added.)

### B. Description of Baseline Cancer Risk

In its discussion of air quality impacts, the EIR attempts to estimate the existing level of cancer risk from TACs in the neighborhood surrounding the campus. The EIR first presents estimates based on the levels of certain TACs measured by BAAQMD and CARB in San Francisco. Because this data does not include cancer from exposure to diesel particulate matter, another recognized TAC, the EIR also uses CARB estimates of cancer risk from exposure to diesel emissions in the Bay Area as of the year 2000.

Petitioner SF faults the EIR for failing to provide a more recent estimate of baseline cancer risk from diesel particulate matter. "Generally, the lead agency should describe physical environmental conditions as they exist at the time the notice of preparation is published." (Guidelines, § 15125, subd. (a)(1).) But this is not an inflexible rule and must be read in light of the teaching that "in reviewing an EIR's discussion, we do not require technical perfection or scientific certainty: ' " '[T]he courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " ' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 515.) The draft EIR discloses that CARB estimates the statewide cancer risk from diesel admissions to have declined about 10 percent between 1995 and 2012, and the final EIR shows an even steeper decline by 2020 *and* quantifies cancer risk in the Bay Area from diesel particulate matter in 2020. In light of this downward trajectory and the information in the final EIR, we are satisfied that the EIR's description of rates of cancer risk associated with diesel particulate matter more than met this standard of good faith.

### C. Failure to Consider Baseline Cancer Risk

Petitioner SF also faults the EIR for adopting a threshold for significance based on the incremental cancer risk added by the Plan, rather

than basing significance on the total local cancer risk once the Plan is implemented.  Petitioner cites no decision or regulation adopting that position, and we find no merit in petitioner's various arguments in support of it.  We also recall that " 'CEQA grants agencies discretion to develop their own thresholds of significance' and an agency's choice of a significance threshold will be upheld if founded on substantial evidence."  (*Mission Bay*, *supra*, 6 Cal.App.5th at p. 206.)

A primary purpose of an EIR is to evaluate a project's impact on the environment.  Necessarily, that impact is determined by the environmental change the project will bring about.  (See *Building Industry*, *supra*, 62 Cal.4th at p. 388 ["CEQA calls upon an agency to evaluate" "a project's potentially significant *exacerbating* effects on existing environmental hazards"].)  A threshold of significance can be used to determine whether that change should be considered "significant," as the term is used by CEQA.  As described above, the Regents' chosen threshold for significance does just that.

Petitioner protests that "under CEQA, an EIR analyzes the environmental impacts of the proposed project on the environmental setting."  But that is exactly what the chosen threshold of significance does—measure the change in cancer risk created by the Plan.  Petitioner also objects that this threshold "is a policy judgment, not a finding of fact based on evidence."  But determinations of significance necessarily involve such judgments.  Estimates of a project's likely impact must be based on evidence; the determination of whether that impact is "significant" comes from comparing the likely impacts against criteria for when an impact is significant.  That a decision is ultimately one of policy does not mean it is not also grounded in evidence.

A hypothetical proposed in petitioner SF's reply brief highlights the fallacy in its argument. Petitioner posits two regions, one with a baseline risk of 50 cancers per million and one with a baseline risk of 30 per million. Petitioner further posits two projects in the respective regions, each of which raises the local risk to 55 cancers per million. By the Regents' threshold, the first impact would not be significant because the increase was only five cancers per million, while the second would be because the increase would be 25 cancers per million. Petitioner contends this is necessarily error because the resulting risk of cancer is the same in both cases. But a project's environmental impact is determined by the *change* brought about by the project, not by the absolute value of the resulting conditions. Because the environmental impact of the second hypothesized project is five times greater than the first (i.e., 25 instead of five cancer deaths), it would not be unreasonable to find one impact significant, but not the other. The baseline level of risk may influence the choice of a threshold for significance, but the impact of a project is appropriately measured by the change the project induces.

### D. *Significance of Cumulative Air Quality Impacts*

Petitioner SF contends that the EIR fails properly to apply its chosen threshold for the significance of cumulative air quality impacts. " 'The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects.' [Citation.] It is an impact 'which is created as a result of the combination of the project evaluated in the EIR together with other projects causing related impacts.' " (*League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 147–148.)

63

As noted, the EIR adopts the BAAQMD cumulative impacts standard of an increase of more than 100 cancer cases per one million persons. (BAAQMD 2017 CEQA, *supra*, § 2 & Table 2-1, at p. 2-2.)  As the draft EIR explains, the EPA considers this "within the 'acceptable' range of cancer risk. A cumulative cancer risk of 100 in one million is also used by the City of San Francisco."  The final EIR is even more specific:  "[a]ccording to BAAQMD, a project's cumulative cancer risk would be significant if the increase in cancer risk from the project, when combined with the risk from other sources within 1,000 feet of the project, exceeds 100 in a million."

Petitioner SF first contends that the EIR's application of the threshold is confusing because of inconsistencies in the EIR's explanation of its threshold.  What petitioner purports to find confusing is that the EIR does not sum ambient TAC concentrations with TAC emissions resulting from the project and other identified local sources.  But petitioner raised this concern in commenting on the draft EIR, and the university's response provides the necessary clarity:  Cumulative cancer risk, the final EIR explained, is assessed by summing emissions from the project and all other sources within 1,000 feet, *not* by adding these numbers to regional or background risk levels. As articulated in the final EIR, we find the description of the cumulative threshold sufficiently clear.

Petitioner SF also contends that the cumulative threshold "suffer[s from] the same legal defect" discussed above, that it is "applied without regard to the baseline cancer risk."  But whether individual or cumulative, the environmental impact of a project is the change in the environment brought about by the project.  A threshold for determining the significance of such a change may properly be based on the magnitude of that change, without regard for baseline conditions.  (*Building Industry*, *supra*, 62 Cal.4th

64

at p. 388.)  In some circumstances an agency might appropriately consider baseline conditions in setting a threshold of significance, but this is not required (*ibid*.), and substantial evidence supports the EIR's decision to employ the BAAQMD cumulative threshold, in which significance is based exclusively on the increase in cancer cases attributable to sources within 1,000 feet of the project.

The cases petitioner cites for its contention that "the severity of existing conditions is always a factor in determining significance of project impacts" do not so hold.  In the primary case, *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, the agency discounted a project's ozone impact as insignificant because it was small in comparison with the baseline level of ozone.  The court faulted this conclusion because "[t]he EIR's analysis uses the magnitude of the current ozone problem in the air basin in order to trivialize the project's impact.  In simple terms, the EIR reasons the air is already bad, so even though emissions from the project will make it worse, the impact is insignificant." (*Id*. at p. 718.)  While *Kings County* certainly holds that a high baseline level cannot be used to minimize the significance of a project's contribution, it does not hold that every threshold for significance must incorporate baseline conditions.  The other case petitioner cites, *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 118, disapproved on other grounds, *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109 and footnote 3, merely follows *Kings County*.

Petitioner SF lobs a few additional criticisms at the EIR's adoption of the BAAQMD cumulative threshold, but we need not address these individually.  We must affirm the Regents' adoption of a threshold if it is supported by substantial evidence (*Mission Bay*, *supra*, 6 Cal.App.5th at

p. 206), and we find such evidence in the BAAQMD's discussion of its rationale.

## X. Aesthetics

Petitioner SF contends that the EIR's analysis of visual impacts is inadequate because the EIR fails to consider views from surrounding residential neighborhoods and mistakenly finds the visual impact of the proposed New Hospital not significant. We need not address these claims because we agree with the Regents that the Plan qualifies under a CEQA provision declaring that the aesthetic impacts of certain projects may not be considered significant.

The EIR contains an extensive analysis of the visual impacts of the Plan but explains at the outset that this is for informational purposes only because, under section 21099, subdivision (d)(1) (section 21099(d)(1)), any aesthetic effect of the Plan must not be considered significant.

Section 21099(d)(1) states, "Aesthetic and parking impacts of a residential, mixed-use residential, or employment center project on an infill site within a transit priority area shall not be considered significant impacts on the environment." As relevant here, the statute defines an infill site as "a lot located within an urban area that has been previously developed" (§ 21099, subd. (a)(4)) and a " '[t]ransit priority area' " as "an area within one-half mile of a major transit stop that is existing or planned" (§ 21099, subd. (a)(7)). "[R]esidential" and "mixed-use residential" projects are not defined in section 21099, but an employment center project is "a project located on property zoned for commercial uses with a floor area ratio of no less than 0.75." (§ 21099, subd. (a)(1).) " 'Floor area ratio' " is further defined; it is a measure of how much of the useable portion of a lot is covered by a building. (§ 21099, subds. (a)(2), (a)(5), & (a)(6).)

66

Section 21099 "was enacted as part of Senate Bill No. 743 (2013–2014 Reg. Sess.) to further the Legislature's strategy of encouraging transit-oriented, infill development." (*Covina Residents*, *supra*, 21 Cal.App.5th at p. 725.) "[T]he Legislature has charted a course of long-term sustainability based on denser infill development, reduced reliance on individual vehicles and improved mass transit, all with the goal of reducing greenhouse gas emissions. Section 21099 is part of that strategy." (*Covina Residents*, at pp. 729–730.)

Petitioner SF does not dispute that the Plan calls for infill development in a transit priority area but maintains that section 21099(d)(1) does not apply because the Plan is not a residential, mixed-use residential, or employment-center project. Specifically, the campus is not "located on property zoned for commercial uses," as required by the statutory definition of an employment center project, petitioner urges. (§ 21099, subd. (a)(1).) Because this dispute turns on an issue of statutory construction, our review is de novo.

According to the EIR, the campus is primarily zoned "P (Public)." Petitioner notes that a portion of the campus is zoned "Residential House District, Two-Family," but this designation applies only to residential areas along Third and Fifth Avenues, on the margins of campus; the portions of campus affected by the Plan are zoned P-Public. The university's use of its property, however, is not subject to local zoning regulations. (*Oakland Raiders v. City of Berkeley* (1976) 65 Cal.App.3d 623, 626 ["the University of California is not subject to local regulations with regard to its use or management of the property held by the Regents in public trust"].) The P zoning district anticipates this regulatory independence. Although P zoning allows for a variety of public uses, it also expressly authorizes

"[s]tructures and uses of governmental agencies not subject to regulation by this Code." (S.F. Planning Code, § 211.1, subd. (a).) In other words, the City's zoning for the campus essentially defers to the university with respect to land uses permitted on the site.

As explained in the 2014 LRDP, the University of California applies to its properties its own version of zoning, referred to as "functional zones." The functional zones applicable to the developed portion of the campus authorize a variety of essentially commercial uses, including instruction, clinical medical care, laboratory research, offices, food services, retail, and recreation and fitness. There seems little doubt that this zoning equivalent permits commercial development.

Petitioner SF argues that the campus "is not zoned at all" because it is not governed by the City's zoning ordinance, and that section 21099(d)(1) should not apply because the university has not "subject[ed] itself to the regulatory burdens of the Planning and Zoning Law." But the City *does* zone the campus, albeit in a manner that appropriately defers to the university's land-use planning. (San Francisco Planning Code, § 211.1, subd. (a).) And the university has authorized commercial development in the areas where the Plan proposes to build. The dispositive fact is that the property in question is zoned in a manner that allows "commercial uses." (§ 21099, subd. (a)(1).)

We see no basis for construing the statute to require more. In particular, nothing in the language of the statute requires that applicable zoning allow *only* commercial uses. And we detect no suggestion in section 21099 that the provision was intended not to reach landowners, such as the university, that are exempt from local government's land use regulation. Rather, the requirement in subdivision (a)(1) that a project be zoned to allow

68

"commercial uses" appears intended simply to ensure that the property can lawfully be used for commercial purposes, consistent with its designation as an "[e]mployment center." Our task is "to discern and give effect to the legislative intent" behind section 21099 (*Summers v. Newman* (1999) 20 Cal.4th 1021, 1026), and we see no reason the Legislature would have wanted to carve out university-owned property from the incentives it was establishing to promote infill development.

Applying section 21099(d)(1), the EIR properly concluded the aesthetic effects of the Plan may not be considered significant environmental impacts. We accordingly do not reach petitioner SF's contentions that the EIR improperly analyzed visual impacts. (*Protect Telegraph Hill v. City and County of San Francisco* (2017) 16 Cal.App.5th 261, 272.)

## XI. Shadows

Petitioner SF contends that the EIR improperly fails to analyze the impact on the neighborhoods surrounding the campus of shadows created by the Plan's new buildings. The EIR does, in fact, analyze the impact of shadows cast by the proposed new buildings, but it assesses their impact only on "publicly accessible open spaces and recreation facilities near the project site." The EIR finds that the Plan's new development would cast shadows on parks and open spaces in the vicinity of campus, but that the impact is not significant because the shadows "would reach these spaces during the time of day when usage is expected to be lowest." We find no fault with the EIR's discussion of shadows.

As explained in the final EIR's response to comments, the EIR chose to analyze shadows cast on public open spaces because City ordinances prohibit the issuance of a building permit for a proposed structure if its shadows will have "any adverse impact" on the use of City parks, "unless it is determined

69

that the impact would be insignificant." (S.F. Planning Code, § 295, subd. (b).) Although the university is not bound by City ordinances, it " 'strives to be substantially consistent with local policies where feasible.' " The EIR asserts that it did not analyze the impact of shadows on city streets and buildings because this impact was outside its criterion for significance, which address only the impact on public open spaces. The final EIR notes, however, that the diagrams developed for the shadow analysis, which demonstrate "the extent of net new shadow that would fall on all locations throughout the Parnassus campus vicinity," reveal that "for the most part, areas one block or more distant from the campus site would be subject to only occasional shadow during the course of a year," generally in early morning or late afternoon.

Petitioner SF contends that the EIR should have analyzed the impact of shadows cast by proposed buildings on surrounding neighborhoods because there is a fair argument that these shadows might constitute a significant environmental impact. We reject this contention for two reasons. First, it ignores that the EIR *does* analyze the impact of shadows on surrounding neighborhoods, albeit against a significance threshold that petitioner considers insufficient. Second, we find no fair argument—no substantial evidence to support the conclusion—that the project will have a potentially substantial adverse effect on the environment in this regard. (See *Visalia Retail, supra*, 20 Cal.App.5th at p. 13; *World Business Academy, supra*, 24 Cal.App.5th at p. 499; Guidelines, § 15382.) Shadows are by nature fleeting; the campus is located in a densely urbanized city where streets and yards are already subject to the shadows cast by neighboring buildings; and shadows present no threat to health. Even if the shadows cast by new buildings on the campus add, at particular times of day or in some seasons, to the shadows

70

already present in the neighborhoods on its borders, there is no reason to believe that the effect will be so predominant or pervasive as to cause a substantial adverse change in the environment.

Petitioner SF does not point to any substantial evidence of a possible significant impact. Petitioner places primary reliance on the comments of an urban planner who, while acknowledging that the campus's surrounding neighborhoods "currently receive shadows from existing structures," was concerned "that the increased height of [certain buildings proposed in the Plan] will further increase the time and frequency of the shadows." The mere fact that the project will cause a change in the environment, however, does not mean that the change will be a significant environmental impact. We agree with the Regents that the planner's comments fall short of suggesting the possibility of a substantial adverse change in the environment. The EIR's shadow studies confirmed as much, demonstrating the lack of any significant shadow impact on surrounding neighborhoods.

## XII. Wind

Petitioner SF argues that the EIR's mitigation of wind impacts is improper because details of the mitigation are deferred unnecessarily, and without requiring future compliance with a specific performance standard. We consider the first issue almost frivolous and the second close, but ultimately find the EIR adequate.

Surrounded on three sides by the Pacific Ocean and San Francisco Bay, the City is a windy place. As the EIR recognizes, winds confronting pedestrians can be intensified by the presence of buildings that are "considerably taller than surrounding structures, particularly where such taller buildings present large planar surfaces towards the prevailing winds." Buildings that are less than 80 feet taller than surrounding buildings,

71

however, tend not to increase wind effects significantly. The EIR recognizes that City ordinances have established a "wind hazard criterion" for judging the significance of wind impacts: the creation of winds sustained at a speed of 26 miles per hour for one full hour of the year. (S.F. Planning Code, § 148, subd. (a).) The EIR adopts this as a criterion for significance, to the extent the project "[c]reate[s] wind hazards in publicly accessible areas of substantial pedestrian use." The EIR observes that the City has also established a "pedestrian comfort criterion" of 11 miles per hour for pedestrian areas but, although the EIR assesses wind impacts against this threshold, it does not purport to adopt this lower threshold as a standard of significance.

The EIR's discussion of wind impacts recognizes that some of the buildings proposed in the Plan, particularly the New Hospital, have the potential to create substantial wind effects. Computer modeling based on simple massing suggests that the Plan's buildings could result in winds exceeding at least the pedestrian comfort criterion in several areas on and around campus. More precise modeling, relying on wind-tunnel testing to evaluate the specific design and siting of a building, was not performed because building designs were not yet available. In the absence of more precise information, the EIR predicts the New Hospital could, in some areas, create conditions exceeding "the wind hazard criterion," and it therefore assumes that the New Hospital would cause a significant wind impact that would be unavoidable with mitigation.

As required when a significant impact is found, the EIR adopts a mitigation measure to minimize pedestrian wind impacts. The mitigation measure requires wind-tunnel testing of the design of any new building higher than 80 feet, evaluated under conditions representative of anticipated

72

Plan buildout. If the testing indicates the building would "increase the hours of wind hazard exceedance or the number of test points subject to hazardous winds, compared to then-existing conditions," the university is required to "work with the wind consultant to identify feasible mitigation strategies, including design changes (e.g., setbacks, rounded/chamfered building corners, stepped facades, etc.), to eliminate or reduce wind hazards to the maximum feasible extent. If UCSF finds that these changes or other wind speed reduction strategies are not feasible as they would unduly restrict the proposed building's space program, result in operational inefficiencies, and/or [impose] substantially higher costs, the building(s) may nonetheless be approved provided that the project incorporates wind speed reduction strategies to the maximum feasible extent, as determined by UCSF in consultation with the wind consultant. Wind speed reduction strategies could also include features such as landscaping, localized installation of porous/solid screens, installation of canopies along building frontages, and the like."

As discussed *infra*, an agency may not defer "[f]ormulation" of mitigation measures but may defer "specific details . . . when it is impractical or infeasible to include those details during the project's environmental review." (Guidelines, § 15126.4, subd. (a)(1)(B).) Petitioner SF disputes that any such deferral was necessary, contending that designs for the new buildings, including the New Hospital were, or could have been, available for wind-tunnel testing while the EIR was being prepared. But petitioner points to no persuasive evidence that this is true, and substantial evidence proves otherwise, as the EIR makes clear that planning for the New Hospital was still in process, which is why it would require a subsequent, project-level EIR. Even at the time of the Plan's final EIR, the specific design of New Hospital

73

was still "being developed." Since any concept design for the building was necessarily subject to change and petitioner does not dispute that a final building design is necessary for wind-tunnel testing, this aspect of its challenge is without merit.

As for the second aspect of petitioner SF's challenge, an EIR may defer details of a mitigation measure only if "the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and that will [be] considered, analyzed, and potentially incorporated in the mitigation measure." (Guidelines, § 15126.4, subd. (a)(1)(B).; see *East Oakland, supra,* 89 Cal.App.5th at pp. 1254–1255.) Petitioner acknowledges that the mitigation measure identifies a specific performance criterion—new exceedances of the 26 miles per hour standard in pedestrian areas—but contends it does not require this criterion to be met.

At the outset, we observe that the mitigation measure need not require full compliance with the City's 26 miles per hour wind hazard criterion. CEQA does not require that all environmental impacts of a project be reduced below the level of significance. A lead agency may approve a project with unmitigable significant impacts if it adopts a statement of overriding considerations (§ 21081, subd (b); *Butte County, supra,* 13 Cal.5th at pp. 627–628), as the Regents did here. The question is whether this mitigation measure articulates a sufficiently specific performance standard that the mitigation efforts must meet. (Guidelines, § 15126.4, subd. (a)(1)(B).) We conclude that the measure's requirement to "reduce wind hazards to the maximum feasible extent" passes the test because the measure defines

74

feasibility with reference to "the proposed building's space program, . . . operational inefficiencies, and/or substantially higher costs."

But we acknowledge that petitioner SF's argument finds some support in the recent *East Oakland* decision, which reached a contrary conclusion regarding a similar mitigation measure. The project there was a new professional baseball park, situated in a sizable proposed commercial development that would feature several other large new buildings. (*East Oakland*, *supra*, 89 Cal.App.5th at p. 1237.) Because the size, design, and location of buildings other than the ballpark had not yet been determined, the project sponsor was unable to determine wind impacts with precision but anticipated they would be significant and unavoidable. (*Id.* at p. 1273.) The mitigation measure in *East Oakland* required wind-tunnel analysis for any building exceeding 100 feet in height, and defined a significant wind impact as winds over 36 miles per hour for an hour. (*Ibid.*) If wind-tunnel analysis determined that a building's design would cause an increase in significant wind impacts, the project sponsor was required to " 'work with the wind consultant to identify feasible mitigation strategies, including design changes (e.g., setbacks, rounded/chamfered building corners, or stepped facades), to eliminate or reduce wind hazards to the maximum feasible extent without unduly restricting development potential. Wind reduction strategies could also include features such as landscaping and/or installation of canopies along building frontages, and the like.' " (*Ibid.*) The *East Oakland* court held that for two reasons this mitigation measure failed to satisfy Guidelines section 15126.4, subdivision (a)(1)(B). (*Id.* at pp. 1273–1274.)

First, the performance standard was not " 'specific' " because it required "a reduction in wind impacts 'to the maximum feasible extent *without unduly restricting development potential*.' " (*East Oakland*,

*supra*, 89 Cal.App.5th at pp. 1273–1274.)  As the *East Oakland* court explained, "[e]ven assuming that a mitigation measure may, in appropriate circumstances, strike a balance between the reduction of environmental impacts and commercial functionality, the mitigation measure must inform the public *where* that balance has been struck.  Mitigation measures 'need not include precise quantitative performance standards' [citation], but [Guidelines, s]ection 15126.4's reference to 'specific' performance standards implies a reasonably clear and objective measure of compliance." (*Id*. at p. 1274.)  The *East Oakland* mitigation measure failed this test because "the point at which a restriction on development potential becomes 'undue' depends entirely on the value placed on reducing wind impacts by the agency charged with overseeing compliance with the mitigation measure," and because the EIR failed "to explain the concept of 'development potential.' " (*Ibid*.)

Second, the *East Oakland* court held that the mitigation measure did not sufficiently identify types of potential action that could feasibly achieve the proposed performance standard and would be considered in implementing it.  "The wind mitigation measure merely mentions three possible design changes in a parenthetical, combined with a final mention of 'landscaping and/or installation of canopies along building frontages, and the like.'  There is no indication whether more significant changes in overall building size or location may be considered or, if not, why more substantial changes are deemed infeasible." (*East Oakland, supra*, 89 Cal.App.5th at pp. 1274–1275.)

Although the performance standard articulated in the Regent's mitigation measure is similar, we are persuaded that it differs enough to articulate a "reasonably clear and objective measure of compliance" and adequately inform the public where the balance between wind mitigation and

76

commercial functionality has been struck.  (*East Oakland*, *supra*, 89 Cal.App.5th at p. 1274.)  Our conclusion is influenced by the nature of wind impacts and their mitigation.  As noted above, significant wind impacts are caused primarily by building size, particularly building height.  The best way to reduce wind impacts is to reduce the size of the building causing the impact.  Reducing building size, however, risks frustrating the project sponsor's objectives.  Other types of mitigation are less effective but also have less impact on the building's utility.

Under the EIR's wind mitigation measure, the university must "identify feasible mitigation strategies . . . to eliminate or reduce wind hazards to the maximum feasible extent."  The word "feasible" is key.  "If UCSF finds that . . . wind speed reduction strategies are not feasible as they would unduly restrict the proposed building's space program, result in operational inefficiencies, and/or [impose] substantially higher costs, the building(s) may nonetheless be approved. . . ."  In other words, the university is required to apply the modest mitigation strategies identified by the measure—"design changes" such as "setbacks, rounded/chamfered building corners, stepped facades, etc." and "landscaping, localized installation of porous/solid screens, installation of canopies along building frontages, and the like"—to the extent those measures can be successfully employed to reduce the wind impact of the offending building, but the university will not be required to implement these or other measures to the extent they would reduce the project's "space program," which we understand to mean requirements for a building's floor space, or impose "operational inefficiencies and/or substantially higher costs."  The EIR discusses in several places the Plan's requirements for new space and the concepts of space utilization and operational inefficiencies, putting some meat on the bones of those phrases.

77

For example, the EIR assesses the reduced footprint alternative with a 19-story New Hospital as suffering from "operational inefficiencies" because its "irregularly-shaped footprint . . . would result in inefficient floor plates for patient rooms, surgery suites, diagnostics and testing, labs and other hospital functions."  Against the backdrop of this discussion, the standard expressed in this mitigation measure is more specific than the standard at issue in *East Oakland* of "unduly restricting development potential."  (*East Oakland, supra,* 89 Cal.App.5th at p. 1274.)  The Regent's standard requires the university to implement the identified type of wind mitigation measures, but only to the extent those measures would not significantly change the size or interfere with the operation of the proposed buildings.[7]

Petitioner SF objects that this is not a true standard, arguing that the EIR was required to adopt as a performance standard its threshold of significance for wind impacts.  We might agree if the Regents were required to mitigate wind impacts below the level of significance, as is ordinarily the case.  In that event, the mitigation measure would be required to describe, in a reasonably clear and objective manner, the threshold for significance and adopt that threshold as a performance standard.  The Regents, however, adopted a statement of overriding considerations with respect to wind

---

[7] When, at oral argument, counsel for petitioner SF was asked what language petitioner would propose to make the mitigation measure's performance standard more specific, he suggested only use of the word "feasible."  When it was pointed out that the measure already uses that term repeatedly, counsel responded that the mitigation measure's definition of the term was not consistent with CEQA, ignoring that CEQA's concept of feasibility includes the consideration of policy objectives.  (See *California Native Plant Society, supra,* 177 Cal.App.4th at p. 1001 ["an alternative that 'is impractical or undesirable from a policy standpoint' may be rejected as infeasible' "].)  The wind mitigation measure's use of the term properly takes into account such objectives.

impacts.  Although we agree with *East Oakland*, *supra*, 89 Cal.App.5th at p. 1275, that the adoption of such a statement does not exempt an agency from the obligation to establish a specific performance standard, its adoption can change the nature of the standard required.  By adopting a statement of overriding considerations, the Regents expressed their view that the environmental benefits of wind reduction measures do not justify impeding the economic, technological, and other benefits of the Plan by reducing building size, creating operational inefficiencies, or imposing substantially higher costs.  (§ 21081, subd. (b); see *Butte County*, *supra*, 13 Cal.5th at pp. 627–628.)  Given the Regents' acceptance of significant wind impacts, the performance standard was not required to specify an inflexible goal, but rather to describe in a reasonably clear and objective manner what the university will and will not do to reduce the wind impacts of the Plan's buildings.  We are satisfied that the wind mitigation measure satisfies this requirement.[8]

We acknowledge that the list of proposed actions to mitigate wind impacts in the EIR is little different from list of actions found inadequate in *East Oakland*, *supra*, 89 Cal.App.5th at pages 1274–1275, adding only "localized installation porous/solid screens."  The mitigation measure recognizes, however, that these are merely illustrative examples of the design and landscaping features that may be used to reduce wind impacts, adding

---

[8] *King & Gardiner* (2020) 45 Cal.App.5th 814, cited by counsel at oral argument, is not to the contrary.  *King & Gardiner* properly observes that the adoption of a statement of overriding considerations "does not negate the statutory obligation to implement feasible mitigation measures."  (*Id.* at p. 852.)  But the case does not address the issue presented here:  whether the adoption of such a statement can influence the nature of a performance standard adopted to guide future mitigation.

"etc." and "and the like" to its two lists of proposed actions.  And unlike in *East Oakland*, there is no question here that "significant changes in overall building size" are not among the mitigation strategies that will be considered. (*East Oakland, supra*, 89 Cal.App.5th at pp. 1274–1275.)  Given the nature of the EIR's performance standard, we find the list of proposed actions in mitigation sufficient.[9]

## DISPOSITION

The trial court's judgment in each of the three Superior Court actions is affirmed.

TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

---

[9] At the court's request, the parties provided supplemental briefing addressing whether petitioner SF's wind-related challenge to the EIR was moot in light of the subsequent certification of a project-level EIR for the New Hospital (or any other recent event).  Having reviewed the parties' submissions, we decline to resolve the issue on mootness grounds because, as petitioner points out, the mitigation measure also applies to building projects other than the New Hospital, including to the Research and Academic Building, which may also cause significant wind impacts.

Trial Court:      Alameda County Superior Court

Trial Judge:      Hon. Frank Roesch

Counsel:          Soluri Meserve, Patrick M. Soluri, Osha R. Meserve, and
                  James C. Crowder for Plaintiffs and Appellants Yerba
                  Buena Neighborhood Consortium, LLC and Parnassus
                  Neighborhood Coalition et al.

                  Thomas N. Lippe for Plaintiff and Appellant San
                  Franciscans for Balanced and Livable Communities

                  The University of California Office of General Counsel,
                  Anagha Dandekar Clifford; Lubin Olson &
                  Niewiadomski, Charles R. Olson, Philip J. Sciranka,
                  Carolyn J. Lee; Monchamp Meldrum, Amanda J.
                  Monchamp, and Hope Schmeltzer for Defendants and
                  Respondents

*Yerba Buena Neighborhood Consortium, LLC et al. v. Regents of the University of California/San Franciscans for Balanced and Livable Communities v. Regents of the University of California* (A166091/A166094)